218 P.3d 211 (2009)
Gregg MAY and Margo May, John Christensen and Eunice Christensen, Erik Elam and Karen Elam, Ernie Helling and Lois Hellng, Larry Johnson and Kristin Johnson, Jim Luzzi, and Anne Luzzi, Steve Saxon and Paula Smith, and William Weaver and Mary Lou Weaver, Appellants,
v.
Ronald ROBERTSON and Kathryn Robertson, Jon Kvinsland and Mari Kvinsland, Pierce County and Washington State Department of Ecology, Respondents.
No. 37911-2-II.
Court of Appeals of Washington, Division 2.
October 13, 2009.
*213 David Alan Bricklin, Bricklin & Newman, LLP, Seattle, WA, for Appellants.
Margaret Yvonne Archer, Attorney at Law, Tacoma, WA, for Respondents.
Jill Guernsey, Pierce County Prosecutor's Office, Tacoma, WA, Katharine G. Shirey, Attorney Generals Office, Ecology Division, Olympia, WA, Erik and Karen Elam (Appearing Pro Se), Gig Harbor, WA, for Other Parties.
HUNT, J.
¶ 1 Gregg and Margo May, several of their neighbors,[1] Pierce County, and the Washington *214 State Shoreline Hearings Board (collectively, the Mays) appeal the superior court's reversal of the Shoreline Hearings Board's denial of a permit for Ronald and Kathryn Robertson and Jon and Mari Kvinsland to build a joint-use pier originating from the common boundary between their two waterfront properties. The Mays argue that the Board correctly concluded that the joint-use pier would (1) conflict with the Pierce County Code (Code) and Shoreline Master Program, (2) undermine the policies set forth under the Washington State Shoreline Management Act, and (3) cause adverse cumulative effects. Holding that substantial evidence does not support the Board's conclusions and that the Board's conclusions were based on clearly erroneous applications of the law, we affirm the superior court's reversal of the Board's decision and reinstate the Hearing Examiner's approval of the Robertsons' and the Kvinslands' Substantial Development Permit to build a joint-use pier.

FACTS

I. Shoreline Development

A. Joint-Use Pier
¶ 2 Ronald and Kathryn Robertson and Jon and Mari Kvinsland own adjacent waterfront properties on Hale Passage in unincorporated Pierce County. They applied for a permit to construct a joint-use pier, ramp, and float structure (joint-use pier)[2] that would extend 100 feet into the water from "the property line between their respective parcels." Their development site is part of a 300-yard, crescent-shaped beach within Pierce County's Rural Residential Environment shoreline designation.
¶ 3 The Robertson and Kvinsland families intend to use the proposed pier for recreational purposes, including swimming, boating, fishing, and temporary moorage. Although both families have buoys and the Robertsons' property includes a concrete boat ramp, the joint-use pier would provide safer boat and water access for their older and disabled family members. The joint-use pier would measure 6 feet wide by 50 feet long; it would also include a 4-foot by 32-foot aluminum ramp and an 8-foot by 24-foot float section. Eight galvanized steel pilings would support the pier and would provide "stops"a mechanism to prevent the pier from grounding on the beach during low tide. The pier structure would use metal grating to allow light to pass through to the water below.
¶ 4 The Robertsons and the Kvinslands also want to install a separate floating watercraft lift (float lift) to provide long-term moorage space for the Robertsons' boat, approximately 150 feet from the pier's end (425 feet from the Robertsons' bulkhead). The float lift would measure 18 feet long by 12 feet wide. The Kvinslands intend to use their existing buoy, not the float lift, for long-term moorage of their boat.

B. Rural Residential Environment
¶ 5 This Rural Residential Environment shoreline designation is an area of "medium-intensity land use" that serves as a buffer between highly intensive urban development and non-intensive rural development areas. After the Urban Environment, the Rural Residential Environment is the second most intensive land use designation under the County Shoreline Master Program. In both the Urban and the Rural Residential environments, the County permits outright the construction of uncovered salt water piers that measure 50 feet or less in length and cost less than $2,500. For a pier that exceeds these length or cost limitations or otherwise "materially interferes with the normal public use of the water or shorelines," the Code requires a Substantial Development Permit (SDP).
¶ 6 The proposed pier site lies about midpoint along a beautiful, though not pristine, 300-yard-wide crescent beach. Many residential *215 developments border this stretch of beach, including waterfront homes, seawalls, bulkheads, and shoreline moorage devices. In addition, three 50-foot piers and one 150-foot pier are visible on either side of this beach, which itself currently contains no over-the-water structures.
¶ 7 Before submitting their permit applications, the Robertsons and the Kvinslands hired Daniel Cheney, marine biologists form BioAquatics International, LLC, to conduct a biological evaluation of the development site. After surveying and evaluating the area, Cheney concluded that (1) the joint-use pier would have "no significant effect" on area fish; and (2) the pier's design would include grating, pile stops, and other mitigation measures to reduce shading and environmental impacts to the bottom habitat.

II. Procedure

A. Permit Applications
¶ 8 The Robertsons and the Kvinslands submitted their SDP joint-use pier application to the County;[3] they also applied for a Shoreline Conditional Use Permit (SCUP) to install the float lift. While these permit applications were pending, the Mays wrote to the County's Department of Planning and Land Services to express concerns about the pier's aesthetic and environmental impacts. Area residents also signed a petition opposing the Robertson-Kvinsland permit applications. The Squaxin Island Indian Tribe opposed the permit applications by letter, asserting that the joint-use pier would degrade forage-fish habitat, contrary to tribal goals for salmon recovery.

B. County Determination of Non-Significance
¶ 9 The County Planning Department issued a Determination of Non-Significance (DNS), concluding that the joint-use pier "will have no significant adverse environmental impacts on fish and wildlife, water, noise, transportation, air quality, environmental health, public services and utilities, or land and shoreline uses." Ex. at P11. The Mays did not appeal the DNS, but they asked the County, by letter, to reconsider its decision, asserting that (1) the project would adversely impact the environment; (2) Cheney's biological evaluation was insufficient; and (3) although the pier application proposed a structure with eight pilings, the DNS incorrectly noted "10 associated pilings." The County corrected the number of pilings noted on the DNS, but it otherwise denied the Mays' request for reconsideration.

C. Department of Fish and Wildlife Project Approval
¶ 10 Several months later, the Washington State Department of Fish and Wildlife (Fish and Wildlife) issued a Hydraulic Project Approval for the pier project. Ex. at R70. The Mays appealed this decision, alleging that the approval conflicted with Fish and Wildlife's policies. But Fish and Wildlife denied the Mays' appeal, determining that (1) the Mays argued, "without offering proof or [expert] testimony," that because the joint-use pier would be built in a sand lance spawning area,[4] it would necessarily damage that habitat, Ex. at R72; (2) the Mays had incorrectly assumed that the project would ground on the beach during low tide when, in fact, the project's pilings would have "stops" to prevent it from grounding, Ex. at R72; (3) the project complied with Fish and Wildlife policies, state laws, and administrative regulations; and (4) the project was "unlikely to damage sand lance or their habitat." Ex. at R72.

D. County Staff Report
¶ 11 The Peninsula Advisory Commission held a public hearing on the Robertson-Kvinsland permit applications. After the hearing, the Advisory Commission recommended approval of denial of the SDP for the pier but denial of the SCUP for the float lift.
¶ 12 The County Planning Department prepared a Staff Report recommending the *216 opposite result: denying the SDP for the pier but approving the SCUP for the float lift. The Staff Report concluded that (1) the Robertson-Kvinsland joint-use pier proposed "an intensity that is not compatible with the Rural Residential Shoreline environment"; (2) although the shoreline surrounding the development area was "not pristine," it contained few over-the-water structures; (3) the beach's shallow profile was "not conducive to constructing docks that achieve a water depth for longer term moorage," causing boats to ground "on a regular basis"; and (4) the joint-use pier would "unduly impact the views, the marine oriented recreation, and public use of the surface waters." Clerk's Papers (CP) at 30-31.

E. Hearing Examiner's Permit Approval
¶ 13 After reviewing the Staff Report, the Pierce County Hearing Examiner rejected the County Planning Department's recommendation and approved the Robertsons' and the Kvinslands' request for both the SDP for the joint-use pier and the SCUP for the float lift, conditioned on several requirements, including removal of their existing buoys.
¶ 14 Kvinsland filed a request for reconsideration because he wanted to retain his buoy for long-term moorage. He asserted that because the joint-use pier would provide only temporary moorage and the Robertsons planned to use the float lift's single moorage space, he (Kvinsland) needed to retain his existing buoy for long-term moorage. The Hearing Examiner granted his request and revised the condition as follows: "All buoys in excess of one shall be removed from the Jon and Mari Kvinsland parcel." Ex. at R85.

F. Department of Ecology and Army Corps' Approval of Float Lift
¶ 15 After the Washington State Department of Ecology (Ecology) received notice that the Hearing Examiner had approved the Robertsons and the Kvinslands' permit requests, it reviewed their float lift proposal and approved the SCUP. Ecology concluded that the proposal with conditions met the intent of the County Shoreline Master Program and the criteria set forth under WAC 173-27-160 for granting conditional use permits.
¶ 16 The Robertsons and the Kvinslands then applied to the United States Army Corps of Engineers (Army Corps) for a separate permit to install the float lift's hydraulic system.[5] After reviewing the application and Cheney's biological evaluation, the Army Corps issued a letter of permission approving "the proposed dock," which included the float lift.

G. Shoreline Hearings Board Review
¶ 17 The Mays filed an appeal with the Washington State Shorelines Hearings Board, seeking to reverse the Hearing Examiner's approval of the Robertson-Kvinsland permit applications. Board members visited the proposed development site and held an evidentiary hearing.

1. Hearing testimony
¶ 18 At the hearing, Gregg May testified that the Robertson-Kvinsland joint-use pier would "permanently and negatively compromise the natural beauty and character of this magnificent stretch of shoreline." Report of Proceedings (RP) at 46. He asserted that the proposal would impair scenic views; restrict public recreation and access to the beach and water; conflict with existing land and water uses; and negatively impact the surrounding environment.
¶ 19 Wayne Daley, a fisheries biologist expert witness for the Mays, testified that (1) the area around the development site is an important habitat for forage fish; (2) the beach contains "nearshore marine plants" that provide a habitat for forage fish and a place for juvenile salmon to adjust from fresh to salt water during migration; and (3) these plants, including eelgrass,[6] depend on light for growth and survival and that overwater structures and activities can interfere with *217 the habitat by blocking the available light. Although Daley had reviewed scientific materials and "visited" the site[7] before testifying, he did not conduct a biological evaluation or perform an independent assessment of the area in general or of the permit site in particular.
¶ 20 Dan Cheney testified as an expert marine biologist witness for the Robertsons and the Kvinslands, discussing what he had observed while conducting a biological evaluation and a survey of the proposed development site. Cheney testified that (1) although he had observed some sand lance activity, the spawning habitat was located 500 feet east of the project site; (2) he observed no eelgrass within 350 feet of the project site; (3) the pier's design would prevent negative impacts to the forage fish habitat, noting that the pier's float "stops" would prevent it from floating within one foot of the bottom during low tide; and (4) the project's use of grating would reduce shading of the bottom habitat.
¶ 21 Ronald Robertson testified that the joint-use pier would facilitate safe boat access and provide recreational opportunities for fishing and swimming from the structure itself. The pier would shelter swimmers from neighbors who frequently ride jet skis close to the Robertsons' bulkhead at high tide. The Robertsons and the Kvinslands intend to use the pier for recreation, not permanent moorage; they plan to use the float lift and buoy for long-term moorage, eliminating potential grounding of their boats during low tide. Robertson further testified that if the permit request for the joint-use pier were unsuccessful, he and Kvinsland would each construct a 50-foot pier, which use the Pierce County Code permits outright without the need for a shoreline conditional use permit.[8]See Pierce County Code (PCC) 20.56.030A(5).

2. Board's decision, findings of fact, and conclusions of law
¶ 22 After conducting a de novo review, the Board reversed the Hearing Examiner's approval of the Robertson-Kvinsland SDP to construct a pier; and the Board affirmed the Hearing Examiner's approval of the SCUP to install a float liftwith the condition that they must conduct a survey of nearby eelgrass growth to ensure that the lift will not impact it. The Board also issued findings of fact and conclusions of law about (1) the project's impact on area aesthetics and public use, (2) alternative launching and moorage, and (3) the project's environmental compatibility.

a. Findings of fact
¶ 23 The Board found that (1) "[n]o docks currently extend into the sandy beach area," CP at 20; (2) "[t]he proposed [joint-use pier] would be placed in the approximate center of the sandy crescent beach," CP at 24; (3) "[l]ocal residents include the uninterrupted beach itself in their description of the beauty of the expansive view," CP at 24; (4) "[n]o barriers presently exist to free access up and down the full length of [the] beach, and no [piers] or other dock structures have ever been constructed along this stretch of shoreline," CP at 23; (5) a pier of comparable size exists near the "rocky" part of the beach and "three other small structures of 50 feet or less [are] visible from the [proposed development] site," CP at 24; and (6) "[t]he [proposed joint-use pier] is considered to be small by Pierce County standards." CP at 21.
*218 ¶ 24 The Board found that area residents use the beach for shoreline recreational activities, including beach walks, water play, and fishing from the shoreline. It also found that kayakers and sport fishermen use the off-shore waters and that community groups often hold neighborhood activities on the beach. In addition, the Board noted that two public launches are available within two miles of the proposed development site and that Gig Harbor and Day Island each provide permanent moorage facilities within five miles of the site.
¶ 25 The Board also made the following environmental findings: (1) Fish and Wildlife identified the beach as an established area for sand lance and salmon spawning; (2) the National Marine Fisheries Service designated all shoreline areas in the crescent beach vicinity as critical habitat for Chinook salmon; (3) the float lift would be well below the sand lance spawning area; (4) the beach's Rural Residential Environment designation allows medium-intensity land uses; (5) local residents observed some eelgrass growth along the beach and in the vicinity of the proposed float lift, (6) Cheney surveyed the area for eelgrass up to 350 feet waterward of the Robertsons' bulkhead and found none; and (7) although most piers "could be expected to ground" at low tide, the joint-use pier would contain "stops" to keep it elevated.

b. Conclusions of law
¶ 26 In its conclusions of law, the Board stated, "The evidence amply established [the] fact that residents and visitors alike consider the beach and the views it affords to be beautiful and unique." CP at 43 (Conclusion of Law No. 16). The Board also adopted the County Planning Staff's assessment that "it was too much to expect in a rural residential environment to have a dock, a pier, a ramp, and a float lift where owners already had use of two boat launches and buoys."[9] CP at 38. In addition, the Board broadly concluded that "a 100-foot [pier development project] constructed in the middle of the sandy crescent of this beach would have a jarring visual effect, and it would not further any of the priorities set forth in the [County Shoreline Master Program]." CP at 43.
¶ 27 The Board further concluded: (1) "If the [pier] and the float lift were approved without the removal of the existing moorage buoys, as is planned, there would be a total of four moorage spaces for two families," CP at 37; (2) the Robertsons and the Kvinslands "have available to them the means to enjoy their boating uses in the form of two boat launches, buoys, and nearby launching locations, and long-term moorage" at a "reasonable distance," CP at 46; and (3) "[t]he evidence was insufficient to establish that existing launching facilities were generally insufficient." CP at 39.
¶ 28 As for environmental considerations, the Board concluded that (1) because no piers currently interrupted the beach, "[t]he fact that this would be the first [pier] within this sandy crescent is a significant factor in the compatibility analysis," CP at 39; (2) the evidence demonstrated the "fragile nature" of this shoreline; (3) the area's eelgrass beds are currently "in a state of recovery"; and (4) "the shoreline area involved in this proposal is one of high environmental value and that, in this case, the proposed structure would likely be detrimental to the natural habitat currently existing and recovering at this location." CP at 42-43.

H. Superior Court Review
¶ 29 The Robertsons and the Kvinslands appealed the Board's denial of a SDP for their joint-use pier to the Pierce County Superior Court.[10] The superior court reversed the Board's denial of the SDP, ruling that the Board's decision was an erroneous interpretation and application of the law, unsupported by substantial evidence when viewed in the light of the whole record, clearly erroneous, and arbitrary and capricious.
*219 ¶ 30 The Mays appeal the superior court's reversal of the Board and its reinstatement of the Hearing Examiner's grant of a SDP for the joint-use pier.

ANALYSIS
¶ 31 The Mays argue that (1) the joint-use pier is inconsistent with the County Code and Shoreline Master Program and the Washington State Shoreline Management Act; (2) "the project's cumulative effects warrant denial of the [permit]"; and (3) the superior court erred in reversing the Board's decision, which, they assert, was not clearly erroneous, arbitrary or capricious, or unsupported by substantial evidence. The Mays ask us to reverse the superior court's ruling and to reinstate the Board's decision denying the Robertsons and the Kvinslands' permit to build a joint-use pier. Because the Board's factual determinations were unsupported by substantial evidence and its legal conclusions were clearly erroneous in light of the entire record and the applicable shoreline policies, the Mays' argument fails.

I. Standard of Review
¶ 32 The Administrative Procedure Act, chapter 34.05 RCW, governs our review of Shoreline Hearings Board actions. Preserve Our Islands v. Shorelines Hearings Bd., 133 Wash.App. 503, 514-15, 137 P.3d 31 (2006), review denied, 162 Wash.2d 1008, 175 P.3d 1092 (2008). We review the Shoreline Hearings Board's decision, not the decision of the local government or the superior court, limiting our review to the record before the Board. Buechel v. Dep't of Ecology, 125 Wash.2d 196, 202, 884 P.2d 910 (1994). The party appealing the Board's decision bears the burden of demonstrating the invalidity of the Board's actions. Preserve Our Islands, 133 Wash.App. at 515, 137 P.3d 31. A party may challenge the Board's decision on nine different bases, including (1) erroneous interpretation or application of the law, (2) lack of substantial evidence, and (3) arbitrary or capricious action. RCW 34.05.570(3).
¶ 33 We review the Board's interpretation of the Shoreline Management Act and local government shoreline regulations de novo because they involve questions of law. Preserve Our Islands, 133 Wash.App. at 515, 137 P.3d 31. "The proper interpretation of a master program provision is likewise a question of law." Jefferson County v. Seattle Yacht Club, 73 Wash.App. 576, 589, 870 P.2d 987, review denied, 124 Wash.2d 1029, 883 P.2d 326 (1994). Although an agency's interpretation of the law is not binding, we generally accord deference to its legal conclusions. Seattle Yacht Club, 73 Wash.App. at 589, 870 P.2d 987. But, when necessary to ensure that a proposed project complies with the Shoreline Management Act, we may substitute our own judgment for an agency's legal determinations. Id.
¶ 34 Under the clearly erroneous test, we will reverse the Board's decision when, in light of the entire record and the policies contained in the Shoreline Management Act, we are "definitely and firmly convinced that a mistake has been made." Buechel, 125 Wash.2d at 202, 884 P.2d 910; RCW 34.05.570(3)(e). When reviewing the Board's decision for arbitrary or capricious conduct, we ask whether it demonstrated "willful and unreasoning action in disregard of facts and circumstances." Buechel, 125 Wash.2d at 202, 884 P.2d 910 (quoting Skagit County v. Dep't of Ecology, 93 Wash.2d 742, 749, 613 P.2d 115 (1980)). An action is not arbitrary or capricious, however, when exercised honestly and upon due consideration, though it might be felt that it could have reached a different conclusion. Buechel, 125 Wash.2d at 202, 884 P.2d 910.
¶ 35 Additionally, under RCW 34.05.570(3)(e), we determine whether substantial evidence supports the Board's decision when viewed in light of the whole record before the Board. See Seattle Yacht Club, 73 Wash.App. at 588, 870 P.2d 987. "Evidence is substantial if it would convince an unprejudiced, thinking mind of the truth of the declared premise." Seattle Yacht Club, 73 Wash.App. at 588, 870 P.2d 987. Such is not the case here, however.

II. Shoreline Regulations

A. State Shoreline Management Act
¶ 36 Washington's Shoreline Management Act of 1971, codified under Chapter *220 90.58 RCW, incorporates state and local requirements to protect the state's shoreline. RCW 90.58.020. In general, this act requires shoreline development projects to conform to its policies and requirements as well as those set forth under local shoreline master programs. See WAC 173-27-150. It is the State's policy to provide for the management of the shorelines "by planning for and fostering all `reasonable and appropriate uses.'" Buechel, 125 Wash.2d at 203, 884 P.2d 910 (citing RCW 90.58.020). "This policy contemplates protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, while protecting generally the public right of navigation and corollary rights incident thereto." Buechel, 125 Wash.2d at 203, 884 P.2d 910 (citing RCW 90.58.020).
¶ 37 In promulgating the Shoreline Management Act of 1971, the legislature recognized that "ever increasing pressures of additional uses are being placed on the shorelines necessitating increased coordination in the management and development" of the state's shorelines. RCW 90.58.020. The legislature also determined that "unrestricted construction on the privately owned or publicly owned shorelines of the state is not in the best public interest." RCW 90.58.020. Accordingly, the Shoreline Management Act requires local governments to develop a master program to regulate shoreline uses consistently with its guidelines. RCW 90.58.080(1).

B. Pierce County Shoreline Master Program
¶ 38 The Pierce County Shoreline Master Program, adopted in 1974, is a "general, comprehensive, and long-range" plan that provides goal statements, environmental designations, use regulations and supporting policies.[11] The master program directs the County to "consider the goals, policies and use regulations of this Shoreline Master Program" in its land use management actions.[12] In general, it encourages the preservation of natural shoreline resources, "considering such characteristics as scenic vistas, parkways, estuarine areas for fish and wildlife protection, beaches and other valuable natural or aesthetic features."[13]
¶ 39 The master program's goal statement for the "Public Access Element" provides:
Assure diversified access for the public to the shorelines of the county, widely distributed to avoid concentration of user pressure and compatible with retention of natural features; discourage those intrusions that will endanger life, property, or have adverse effects on fragile environments. Preserve and enhance views of the shoreline and water from upland areas.
Br. of Resp't app. B1, at 11 (Shoreline Master Program for Pierce County (1974)) (hereinafter Shoreline Master Program).
¶ 40 The County Shoreline Master Program lists "piers" as a regulated "use activity,"[14] and provides: (1) piers should be allowed in appropriate areas; (2) "[p]iers associated with single family residences should be discouraged"; (3) when evaluating a proposal to build a pier, the county should consider such factors as "environmental impact, navigational impact, existing pier density, parking availability, and impact on adjacent proximate land ownership"; (4) the County should "encourage the use of mooring buoys as an alternative to space-consuming piers such as those in front of single family residences"; and (5) "encouragement should be given to the cooperative use of piers and docks."[15]
¶ 41 The master program also provides: "The use of floating docks should be encouraged in those areas where scenic values are high and where conflicts with recreational boaters and fishermen will not be created." Shoreline Master Program at 38. And "[p]iers in conjunction with recreational development *221 in appropriate areas should be allowed." Shoreline Master Program at 37.

C. Pierce County Code Shoreline Regulations
¶ 42 The Code includes "Shoreline Management Use Regulations" under Title 20. PCC 20.02.010. The Code intends "to allow for all reasonable and appropriate uses of Pierce County's Shorelines without degradation of environmental quality, risk to health or safety, and to insure where development takes place, that it is done in a manner which will promote and enhance the best interest of the general public...." PCC 20.02.010.
¶ 43 The Code also imposes standards to "regulate" and to "promote intensities and qualities of development consistent with the protection of the shoreline environment and its related resources and the policy of the Shoreline Management Act." PCC 20.02.010. For joint-use piers,[16] the Code includes the following provision:
It is the intent of Pierce County to encourage the construction of joint use or community use docks and piers whenever feasible so as to lessen the number of structures projecting into the water. To this end, waterfront property owners are encouraged to explore the advantages of increased dock dimensions which are afforded by the construction of a joint or community use structure.
PCC 20.56.020.
¶ 44 The County Code includes the following "General Criteria and Guidelines for Reviewing Substantial Development Permits":
A. Criteria. The granting of a Substantial Development Permit is dependent upon the County reviewing authority's determination that the proposed project is consistent with the policies of the Master Program and with the following criteria:
(1) Important navigational routes or marine oriented recreation areas will not be obstructed or impaired;
(2) Views from surrounding properties will not be unduly impaired;
(3) Ingress-Egress as well as the use and enjoyment of the water or beach on adjoining property is not unduly restricted or impaired;
(4) Public use of surface waters below ordinary high water shall not be unduly impaired;
(5) A reasonable alternative such as joint use, commercial or public moorage facilities does not exist or is not likely to exist in the near future;
(6) The use or uses of any proposed dock, pier or float requires, by common and acceptable practice, a Shoreline location in order to function;
(7) The intensity of the use or uses of any proposed dock, pier, and/or float shall be compatible with the surrounding environment and land and water uses.
PCC 20.56.040A.
¶ 45 The Code also provides "Development Guidelines" under PCC 20.56.040B. The County's reviewing authority applies these guidelines to "site specific" applications for an SDP "in arriving at a satisfactory degree of consistency with the policies and criteria set forth in this Chapter." PCC 20.56.040B addresses joint-use piers and docks. It provides that "[j]oint dock facilities should have no more moorage spaces than one space per waterfront owner using the dock." PCC 20.56.040B(7)(e).

D. Gig Harbor Peninsula Community Plan
¶ 46 The Gig Harbor Peninsula Community Plan (Community Plan), adopted under Chapter 19B.10 of the Code, "provides a *222 framework for consistent land use standards." Br. of Resp't app. B2 at 1 (Gig Harbor Peninsula Community Plan) at 1.[17] This Community Plan describes area conditions, environmental policies, and the shoreline environment designations adopted under the County master program.[18]
¶ 47 The Community Plan expressly provides that "[p]iers and docks should be permitted in the Urban, Rural-Residential, and Rural shoreline environments."[19] The Community Plan establishes the following policy directives for piers and docks: (1) to "[e]ncourage environmentally friendly dock design" instead of traditional methods, (2) to "[r]equire the joint use of piers and docks whenever possible," (3) to "[c]reate a system of incentives that will encourage adjacent property owners to share docks," and (4) to allow docks/piers to extend a maximum of 150 feet into the saltwater when the circumstances involve some shallow area development.[20]

E. Washington Administrative Code
¶ 48 The Washington Administrative Code sets forth the following criteria to guide an agency's review of a substantial development permit:
(1) A substantial development permit shall be granted only when the development proposed is consistent with:
(a) The policies and procedures of the act;
(b) The provisions of this regulation; and
(c) The applicable master program adopted or approved for the area....
(2) Local government may attach conditions to the approval of permits as necessary to assure consistency of the project with the act and the local master program.
WAC 173-27-150.

III. Pier Consistent with Shoreline Policies and Regulations
¶ 49 The Mays argue that the Robertson-Kvinsland proposal for a joint-use pier was inconsistent with the Code, the Shoreline Master Program, and the Shoreline Management Act because it would impair views, violate the alternative moorage requirement, conflict with the surrounding environment, and improperly create more than one moorage space per waterfront user. The Robertsons and the Kvinslands counter that the Board's decision "reflects a clearly erroneous application" of the Code and master program, which is unsupported by substantial evidence. We agree with the Robertsons and the Kvinslands.

A. View Impairment
¶ 50 Citing our decision in Bellevue Farm Owners Ass'n v. Shorelines Hearings Bd., 100 Wash.App. 341, 997 P.2d 380, review denied, 142 Wash.2d 1014, 16 P.3d 1265 (2000), the Mays first argue that substantial evidence supports the Board's decision that the joint-use pier would "unduly impair area views."[21] In Bellevue Farm Owners, we held that the Shoreline Hearings Board did not err in denying a permit for a 593-foot pier that would include 18 boat slips and accommodate "large recreational vessels" in Westcott Bay in San Juan County. We reasoned that the Board had based its decision, not only on scenic view impairment,[22] which *223 alone apparently could be reason to reject a proposed pier site in San Juan County,[23] but also on (1) the Bellevue Farm Owners association's failure to show that the area's "no dock status quo" was inadequate, and (2) the project's conflict with San Juan County's goal to limit the proliferation of docks. Bellevue Farm Owners, 100 Wash.App. at 357-59, 997 P.2d 380.

1. No "undue impairment"
¶ 51 Unlike the proposed pier in Bellevue Farm Owners, the Robertson-Kvinsland joint-use pier would not "unduly impair" area views. The Bellevue Farm Owners project involved a large-scale multi-use pier that would accommodate "large recreational vessels" and extend 345 feet into Westcott Bay. Here, the pier would accommodate just two families, provide temporary moorage for recreational purposes, and extend only 100 feet into the water.
¶ 52 Furthermore, the San Juan County regulations applicable in Bellevue Farm Owners prohibited piers that would "impair scenic values." In contrast, the Pierce County regulations do not prohibit impairment of scenic views altogether; rather they prohibit piers only when they would "unduly impair[]" views from surrounding properties. PCC 20.56.040A(2). Although the Board found that "[l]ocal residents include the uninterrupted beach itself in their descriptions of the beauty of the expansive view," the proposed pier would not actually obstruct views of the surrounding bay, shorelines, and mountains. To the extent that the Board based its permit denial on view impairment, substantial evidence fails to support its decision.
¶ 53 The Mays focus on "impairment" of downward and lateral view of the currently unobstructed portion of the crescent beach. Although any pier will somewhat obscure a small portion of the beach over which it extends, the Mays fail to show that such obstruction here would constitute "undue" impairment, in violation of the Pierce County Code and regulations. Furthermore, the Mays' focus on view impairment of any kind conflicts with the County's encouragement of multiple uses in this medium intensity designated area, including the use of joint piers. And the Robertson-Kvinsland pier is designed to minimize aesthetic impacts by incorporating a floating pier structure, which uses less building material than over-the-surface construction, and relatively transparent grating material that allows light to pass through.
¶ 54 The Mays' argument also fails because, contrary to their assertion, the Board did not actually conclude that the joint-use pier would "unduly impair" area views or conflict with the shoreline master program; in fact, the Board did not apply these standards at all. Instead, the Board declared that "a 100-foot [pier] constructed in the middle of the sandy crescent of this beach would have a jarring visual effect, and it would not further any of the priorities set forth in [the master program]." CP at 43 (emphasis added). A "jarring visual effect" is not synonymous with "unduly impairing area views." More importantly, the Board failed to establish howand to what extent the joint-use pier would "unduly impair" this view or otherwise affect the views from neighboring residences. PCC 20.56.040A(2).
¶ 55 Additionally, the Board's conclusion that the pier would have a "jarring visual effect" disregards the area's existing residential development, which includes waterfront homes, several piers, moored boats, and a series of bulkheads and seawalls. The Board correctly noted that the Code requires applicants for a substantial development permit to ensure that "[v]iews from surrounding properties will not be unduly impaired." PCC 20.56.040A(2). Nevertheless, the Board *224 seems to have interpreted this requirement as barring any development that changes the shoreline's visual effect, regardless of whether such development actually impairs or "unduly impair[s]" the "[v]iews from surrounding properties." PCC 20.56.040A(2). Such interpretation erroneously expands the County's standards for controlling undue view impairment in this medium development intensity shoreline environment. Thus, the Board clearly misapplied the Code in assuming that the pier's "jarring visual effect" would unduly impair views within the meaning of the Code, without establishing a connection between this "effect" and any "undue" view impairment. Furthermore, as we note above, the record demonstrates that substantial evidence fails to support the Board's ruling on view impairment.

2. Furtherance of master plan priorities
¶ 56 Here, as in Bellevue Farm Owners, the Pierce County Code seeks to "lessen the number of structures projecting into the water." PCC 20.56.020. But in order to achieve this objective in Pierce County, the Code (1) "encourage[s] the construction of joint use or community use docks and piers whenever feasible," (emphasis added); and (2) directs waterfront property owners "to explore the advantages of ... a joint or community use structure." PCC 20.56.020 (emphasis added). The Pierce County Shoreline Master Program similarly provides that "encouragement should be given to the cooperative use of piers and docks"[24] and that "[t]he use of floating docks should be encouraged in those areas where scenic values are high." Shoreline Master Program at 37-38 (emphasis added).
¶ 57 Pierce County allows one 50-foot single-use pier for each shoreline lot in this rural residential environment. PCC 20.56.030A(1)(c)(5); PCC 20.56.030B. Thus, Pierce County "encourages," but does not require, joint-use piers to minimize the potential status quo of multiple single-use piers in the area in which the Robertsons and the Kvinslands have proposed one joint-use pier for two lots. In stark contrast, the San Juan County shoreline regulations that controlled Bellevue Farm Owners maintained a "no-dock status quo" at the proposed development site. See Bellevue Farm Owners, 100 Wash.App. at 358-59, 997 P.2d 380. In expressly recognizing and "encouraging" joint-use piers as desirable alternatives to traditional single-use pier development, the Pierce County shoreline regulations do not promote such a "no-dock status quo" in this medium intensity shoreline development environment.
¶ 58 In concluding that the proposed joint-use pier "would not further any of the priorities set forth in [the master program]," CP at 43, the Board failed to explain how the joint-use pier conflicted with the master plan's priority of encouraging the construction of piers for multi-family, rather than single-family, purposes. Contrary to the Mays' argument and the Board's conclusion, the record demonstrates that the proposed joint-use pier is consistent with (1) the Code's view-impairment criteria; (2) the Code's aesthetic standards for pier development, such as length and width requirements, PCC 20.56.040B; (3) the master program's policy of encouraging the use of floating piers in "areas where scenic values are high"; and (4) the master program's policy of encouraging "the cooperative use of piers and docks." Shoreline Master Program at 37-38. Thus, not only are the Board's conclusions about view impairment unsupported by the record, but also they reflect a clearly erroneous interpretation and application of the law.

B. Alternative Moorage
¶ 59 Next, the Mays argue that substantial evidence supports the Board's denial of the joint-use pier permit based on the availability of reasonable launching and moorage alternatives.[25] This argument fails, *225 however, because the applicable shoreline regulations expressly include joint-use facilities as a "reasonable alternative" to traditional, single-use piers. As the record demonstrates, the Board failed to establish how the Robertson-Kvinsland joint-use pier would violate the Code, especially in light of the Code's express inclusion of "joint use" facilities as a "reasonable alternative" to a single use pier. PCC 20.56.040A(5).
¶ 60 In addition, the Mays argue that the Code's "reasonable alternative" criterion furthers the County's policy of "discouraging docks when alternatives exist," noting that the master program disfavors "piers associated with single family residences." Shoreline Master Program at 37. But this argument underscores the Robertsons and the Kvinslands' position that because the County promotes the use of joint-use piers, their choice to install a joint-use pier, instead of two single-use (50-foot) piers, fulfills the requirement. As the Code indicates, the Robertsons and the Kvinslands' joint-use pier would provide a "reasonable alternative" to "piers associated with single family residences" because it would serve two families and promote "the cooperative use of piers and docks." Shoreline Master Program at 37-38. Additionally, because the Robertsons and the Kvinslands intend to use the pier for recreation, not permanent moorage, the nearby moorage facilities would not provide a "reasonable alternative" for their intended use.
¶ 61 We hold that under these facts, (1) the Board misapplied the Code and the master program in concluding that the Robertson-Kvinsland joint-use pier would conflict with PCC 20.56.040A(5); and (2) substantial evidence does not support its determination on the "reasonable alternative criterion" in light of the Board's misapplication of the law on this point and the resultant undermining of its corresponding factual findings.

C. Compatibility with Surrounding Environment
¶ 62 The Mays next argue that substantial evidence supports the Board's decision to deny the permit based on the project's incompatibility with the surrounding ecology and aesthetics. Again, we disagree.
¶ 63 The Robertsons and the Kvinslands counter that the project meets the compatibility criterion, noting that although the Code regulates the "intensity of [a pier's] use," it does not limit the introduction of joint-use piers. The Code provides, "The intensity of the use or uses of any proposed dock, pier and/or float shall be compatible with the surrounding environment and land and water uses." PCC 20.56.040A(7). Robertson and Kvinsland are correct that the proposed pier meets this criterion.

1. Land and water uses
¶ 64 Contrary to the Mays' argument and the Board's decision, the joint-use pier is compatible with the surrounding environment and land and water uses because it (1) promotes the Code and master program's policy of encouraging joint-use piers as an alternative to single family structures; (2) complies with the Code's aesthetic and zoning requirements, including length and design limitations; and (3) harmonizes with the area's existing land and water uses.
¶ 65 First, as we discuss above, the master program encourages the use of joint use-piers. The master program also promotes the use of floating docks and "[p]iers in conjunction with recreational development." Shoreline Master Program at 37-38.
¶ 66 Second, the Code's intent section "encourage[s] the construction of joint use or community use docks and piers whenever feasible so as to lessen the number of structures projecting into the water." PCC 20.56.020. The Code reads, "[W]aterfront *226 property owners are encouraged to explore the advantages of increased dock dimensions which are afforded by the construction of a joint or community use structure." PCC 20.56.020.
¶ 67 Third, the Community Plan, which incorporates the master program's policies, provides that "[p]iers and docks should be permitted in the Urban, Rural-Residential, and Rural shoreline environments." Gig Harbor Peninsula Community Plan at 113. The Community Plan also recommends (1) "[r]equir[ing] the joint use of piers and docks whenever possible," (2) "[c]reat[ing] a system of incentives that will encourage adjacent property owners to share docks," and (3) allowing docks to extend a maximum of 150 feet into the saltwater when the circumstances involve shallow-area development.[26] Gig Harbor Peninsula Community Plan at 113. The foregoing policies demonstrate that the County recognizes joint-use piers as compatible with the surrounding area and existing shoreline regulations.
¶ 68 Additionally, as the Robertsons and the Kvinslands assert in their briefing, although the Board's analysis focused on the fact that the joint-use pier would be the first 100-foot structure in this crescent beach area, the master program expressly allows piers and docks of medium-intensity uses in this Rural Residential Environment. The joint-use pier also fits within the 150-foot maximum distance established for pier length under both the Community Plan and the Code. PCC 20.56.040B(8)(a). Although the Board found that the crescent beach contained no comparable size piers or other barriers, it noted that "[t]here are three other small structures of 50 feet or less, visible from the site," and that one 150-foot pier stands approximately 1,500 feet from the Robertsons' bulkhead. CP at 20. The parties' exhibit photographs show that the surrounding beach area contains significant residential development including existing piers, waterfront structures, seawalls, bulkheads, and moorage devices.
¶ 69 The Board's focus on alternative facilities and "[t]he fact that this would be the first [pier] within this sandy crescent" are not the proper criteria for evaluating and denying this joint-use pier permit application. Furthermore, in contrast with the Board's conclusions, the evidence discussed above demonstrates that the joint-use pier would not conflict with the area's Rural Residential Environment shoreline designation or the area's existing land and water activities. Rather, the joint-use pier is consistent with and advances this shoreline environment's planned uses. For these reasons, we hold that substantial evidence fails to support the Board's conclusion that the joint-use pier would be incompatible with the surrounding land and water uses.

2. Natural ecology
¶ 70 The Mays next argue that the Board's compatibility analysis correctly determined that the joint-use pier would conflict with the shoreline's natural ecology. The Board concluded that "the shoreline area involved in this proposal is one of high environmental value and that, in this case, the proposed structure would likely be detrimental to the natural habitat currently existing and recovering at this location." CP at 43.
¶ 71 The Mays also assert that substantial evidence supports the Board's decision because: (1) the site is an "essential fish habitat," (2) the Squaxin Island Indian Tribe commented that degradation to this habitat would thwart tribal conservation goals, (3) Fish and Wildlife noted that the area is a habitat of special concern that serves as a migration route for salmon, (4) a boat moored at the joint-use pier would regularly ground on the beach during low tide, and (5) a few neighbors observed eelgrass in the vicinity of the proposed development site. Again, their argument fails.
¶ 72 Although the Mays express legitimate concerns, their expert rendered these last two conclusions without actually conducting a biological evaluation of the proposed development site. Instead, he relied on general *227 reference materials prepared by other scientists. Additionally, his conclusions did not actually determine that the joint-use pier would be incompatible with the surrounding environment; rather, he concluded only that "overwater structures ... can impact the ecological functions of [the] habitat" in general. CP at 26.
¶ 73 Additionally, the Squaxin Island Indian Tribe's commentary on forage fish recovery did not address, let alone establish, that the Robertson-Kvinsland pier would impair the forage fish recovery process. On the contrary, because the Robertsons and the Kvinslands intend to use the joint-use pier for recreation, not permanent moorage, their boats will not ground on the beach during low tide. Moreover, Fish and Wildlife specifically found that this joint-use pier will not harm the beach habitat.
¶ 74 The Board concluded that eelgrass beds in the area are currently in a "state of recovery" and that "the proposed structure would likely be detrimental to the natural habitat currently existing and recovering at this location."[27] CP at 43. In reaching this conclusion, the Board apparently relied on lay testimony from local residents who "recently observed small patches of eelgrass" growing "in the vicinity," though not necessarily at the proposed pier site. CP at 27. But, in so doing, the Board disregarded its own finding that Cheney's biological evaluation found no eelgrass "up to 350 feet waterward of [the Robertsons'] bulkhead." CP at 27.
¶ 75 The Board's conclusion also conflicts with its findings that (1) Fish and Wildlife approved the Robertsons and the Kvinslands' hydraulic permit after determining that the project included "sufficient protections" for fish and wildlife; (2) "[t]he [proposed joint-use pier] is considered to be small by Pierce County standards," CP at 21; and (3) even during low tide "the [proposed joint-use pier's] design includes stops [and] would remain elevated above the tidelands." CP at 22. We hold that the Board's findings and conclusions about eelgrass are unsupported by substantial evidence.[28]
¶ 76 The Board failed to consider all the evidence on the record and failed to establish a logical connection between its findings and its conclusion that the joint-use pier would harm the environment. Therefore, we hold that substantial evidence fails to support the Board's determination that the joint-use pier would be incompatible with the surrounding ecology and aesthetics.

D. Moorage space
¶ 77 The Mays further argue that the joint-use pier would conflict with the Code's development guideline under PCC 20.56.040B(7)(e) that "[j]oint dock facilities should have no more moorage spaces than one space per waterfront owner using the dock." Br. of Appellant at 32. The Mays contend that even if the Robertsons and the Kvinslands removed their existing buoys, the float lift and [pier] would provide three moorage spaces, exceeding the Code's limit. Br. of Appellant at 33. The record shows that this assertion is incorrect.
¶ 78 First, the Mays base this argument on an incorrect reading of the Code. It is undisputed that the joint-use pier would provide two moorage spaces. Yet, the Mays argue that because the pier and the float lift would together provide more than one moorage space per resident user, the Robertsons and the Kvinslands would exceed the Code's moorage-space limitation if the pier and float lift are built. But the Code requires only "dock facilities" to comply with this "one *228 moorage space per resident user" requirement. PCC 20.56.040B(7)(e). The Code contains no similar provision for float lifts, which are separate from dock/pier structures and require a different type of permit (SCUP).[29]
¶ 79 The Board similarly misread and misapplied this Code provision. The Board decided that the Robertson-Kvinsland proposal violated this "one moorage space per resident user" requirement. PCC 20.56.040B(7)(e). The Board reasoned, "If the [pier] and the float lift were approved without the removal of the existing moorage buoys, as is planned, there would be a total of four moorage spaces for two families." CP at 37. But again, this one-space-per-owner portion of the Code applies only to "joint dock facilities" and, thus, excludes buoys and float lifts from its restrictions. Consequently, the Board's determination that the joint-use pier would conflict with the Code and master program is clearly erroneous. On the contrary, because the joint-use pier does not exceed the Code's moorage-space limitation, it complies with PCC 20.56.040B(7)(e).

E. Master Program Policies
¶ 80 The Mays broadly argue that the joint-use pier would conflict with the master program's policies. Based on several of the Board's findings, they contend that the joint-use pier would degrade environmental quality and that it would not serve "the interest of the general public." Br. of Appellant at 34. As the above analysis already demonstrates, however, this argument fails for the following reasons: (1) the master program encourages the "cooperative use of piers" and the use of floating docks "in those areas where scenic values are high"; (2) the master program promotes "joint-use piers" over single use structures and prioritizes recreational uses; (3) the master program's Rural Residential Environment shoreline designation expressly allows for medium-intensity land use, and area residents have built seawalls, bulkheads, and single-family piers within this designated area; and (4) biological evaluations from Cheney and Fish and Wildlife demonstrate that the project would not harm the area fish, eelgrass, or the surrounding habitat.
¶ 81 We hold, therefore, that the Board's conclusion that the joint-use pier would conflict with the master program's policies is clearly erroneous and is unsupported by substantial evidence.

F. Shoreline Management Act Policies
¶ 82 The Mays also broadly argue that the joint-use pier would conflict with the Shoreline Management Act's policies by degrading the environment and failing to serve the best interest of the general public. This argument also fails.
¶ 83 In applying laws under the Shoreline Management Act, we look first to its overall policy. Nisqually Delta Ass'n v. City of DuPont, 103 Wash.2d 720, 726, 696 P.2d 1222 (1985). The act's policy statement provides:
Alterations of the natural condition of the shorelines of the state, in those limited instances when authorized, shall be given priority for single family residences and their appurtenant structures, ports, shoreline recreational uses including but not limited to parks, marinas, piers, and other improvements facilitating public access to shorelines of the state,....
RCW 90.58.020. The act also provides,
Permitted uses in the shorelines of the state shall be designed and conducted in a manner to minimize, insofar as practical, any resultant damage to the ecology and environment of the shoreline area and any interference with the public's use of the water.
RCW 90.58.020. The Shoreline Management Act does not prohibit development of the state's shorelines. Rather, it calls for "coordinated planning" that recognizes and protects private property rights consistent with the public interest. Nisqually Delta Ass'n, 103 Wash.2d at 726, 696 P.2d 1222 (citing RCW 90.58.020).
¶ 84 To achieve these goals, the act provides for a variety of shoreline environments with a varying range of intensity of uses. *229 The Rural Residential Environment designation for this crescent beach and the pier site at issue here specifically plans and provides for medium intensity shoreline development, including the construction of piers along the shoreline. PCC 20.56.030B.
¶ 85 Although the Mays argue that the joint-use pier would conflict with the Shoreline Management Act's policies, they offer no concrete examples about how it would impair public use or cause harm to the surrounding environment; instead, they rely on anecdotal testimonies and generalities about pier impacts, without tying their assertions to fact-based evidence. Contrary to the Mays' argument, the joint-use pier complies with the act's policy of minimizing environmental damage and prioritizing "recreational use."[30] The act not only values recreational use, but it also specifically recognizes recreation as a legitimate purpose for altering the natural shoreline. To this end, the Shoreline Management Act expressly includes "piers" as "shoreline recreational uses." As Robertson testified, his family and the Kvinsland family intend to use the joint-use pier primarily as a recreational structure that would allow family members to swim and to fish from the structure and to participate in boating activities.
¶ 86 Furthermore, the Robertsons and the Kvinslands designed their joint-use pier to minimize environmental impacts. First, instead of building two separate piers, they agreed to share a joint-use pier to reduce environmental and aesthetic impacts to the area. Second, they used design techniques, including grating materials, a floating pier, and a stopping mechanism to reduce shading and disruption to the bottom habitat. Third, they worked closely with Fish and Wildlife and marine habitat expert Cheney to ensure that the project would not adversely affect fish, eelgrass, or the surrounding habitat.
¶ 87 In sum, the record demonstrates that Robertson-Kvinsland joint-use pier fulfills both the letter and the spirit of the Shoreline Management Act's policies. We hold, therefore, that substantial evidence fails to support the Board's decision.[31]
*230 ¶ 88 We affirm the superior court's reversal of the Board's decision and reinstate the Hearing Examiner's approval of the Robertsons and the Kvinslands' SDP to build a joint-use pier.
We concur: BRIDGEWATER, P.J., and QUINN-BRINTNALL, JJ.
NOTES
[1] The Mays' neighbors joining this appeal include John and Eunice Christensen, Erik and Karen Elam, Ernie and Lois Helling, Larry and Kristin Johnson, Jim and Anne Luzzi, Steve Saxon and Paula Smith, and William and Mary Lou Weaver.
[2] Although the record uses the terms "pier," "dock," and "PRF" (pier, ramp, and float) interchangeably, we refer to the Robertsons' and the Kvinslands' proposed development as a "joint-use pier" to minimize confusion.
[3] Because the joint-use pier would measure 100 feet in length and would cost more than $2,500 to construct, the Robertsons and the Kvinslands applied for a SDP.
[4] The Pacific sand lance provides a food source for Chinook salmon.
[5] The Army Corps regulates the installation of floating watercraft lifts through its "Regional General Permit" process.
[6] "Eelgrass" is a grass-like marine flowering plant with dark green, ribbon-shaped leaves that are typically 8 to 20 inches in length.
[7] Although Daley visited the site "and refreshed [his] memory from years past when [he] fished in the area," he did not testify about any on-site observation that he made in conjunction with the proposed pier that affected his assessment. Rather, in preparing his assessment, Daley reviewed information from Fish and Wildlife, shoreline charts, and "technical data concerning the project." Based on these documents and other general reference materials, Daley noted that the proposed development site is part of a "well defined shoreline habitat for spawning sand lance." Daley testified that Fish and Wildlife did not properly consider "the cumulative impact of the use of the site" because "the impacts of boats being continually launched at this site and then tied to the float or the dock" will cause "damage to the shoreline and the eelgrass" beds. Ex. at 31.
[8] We note, however, that if the cost of building a 50-foot pier exceeds $2500, a SCUP would nevertheless be necessary. PCC 20.04.640.
[9] The Board noted that the County Planning Staff had (1) analyzed whether the project would impair views, (2) conducted a balancing test under PCC 20.56.040A to weigh the project's value against view impairment and the public's enjoyment of the beach and the water, and (3) recommended denial of the SDP application.
[10] The Mays did not cross appeal the Board's approval of the SCUP for the float lift.
[11] Br. of Resp.App. B1, at 7 (Shoreline Master Program for Pierce County (1974)) (hereinafter Shoreline Master Program).
[12] Shoreline Master Program at 10.
[13] Shoreline Master Program at 12.
[14] Shoreline Master Program at 21.
[15] Shoreline Master Program at 37-38.
[16] The Code defines a "pier" as "a structure which abuts the shoreline and is built over the water on pilings and is used as a landing or moorage place for marine transport or for recreational purposes." PCC 20.56.010B. The Code defines a "joint use pier or dock" as a pier or dock structure including a gangway and/or float "which is intended for the private, noncommercial use of not more than four waterfront building lot owners, at least one boundary of whose building lot lies within 1,000 feet of the boundary of the lot on which the joint use pier or dock is to be constructed." PCC 20.56.010J.

Similarly, the Code defines a "dock" as "a structure which abuts the shoreline and floats upon the water and is used as a landing or moorage place for marine transport or for recreational purposes, but does not include recreational decks, storage facilities, or other appurtenances." PCC 20.56.010A.
[17] Br. of Resp't app. B2 at 1 (GigHarbor Peninsula Community Plan).
[18] GigHarbor Peninsula Community Plan at 97.
[19] GigHarbor Peninsula Community Plan at 113.
[20] GigHarbor Peninsula Community Plan at 113.
[21] The Pierce County Code's criteria for reviewing substantial development permits provides: "Views from surrounding properties will not be unduly impaired...." PCC 20.56.040A(2). The master program encourages the preservation of "scenic vistas" and "aesthetic features" and enhancing "views of the shoreline and water from upland areas." Shoreline Master Program at 11-12. The Pierce County master program also promotes joint-use piers and docks, providing that "[t]he use of floating docks should be encouraged in those areas where scenic values are high." Shoreline Master Program at 38.
[22] After Fish and Wildlife expressed concerns about the proposed pier's shading of eelgrass beds in Westcott Bay, the community association shortened the proposed pier to 345 feet, which included a 230-foot fixed pier and a floating portion that would rest on the mudflats during low tide. Bellevue Farm Owners, 100 Wash.App. at 346, 997 P.2d 380. The Shoreline Hearings Board determined that the proposal was inconsistent with San Juan County's master program, which specifically encouraged the use of piers "where scenic values will not be impaired." Bellevue Farm Owners, 100 Wash.App. at 357-59, 997 P.2d 380.
[23] The pertinent portion of San Juan County's Code provided: "[E]very application ... for dock or pier construction shall be evaluated on the basis of multiple considerations, including but not necessarily limited to ... scenic views, and public access to the shoreline." Bellevue Farm Owners, 100 Wash.App. at 357, 997 P.2d 380.
[24] Emphasis added.
[25] In its findings, the Board determined that (1) two public boat launches presently exist near the Robertson-Kvinsland proposed development site, (2) Gig Harbor and Day Island both provide permanent moorage facilities, and (3) long-term moorage is available at a reasonable distance. But the Board did not discuss whether any of these facilities provided a "reasonable alternative" to Robertson-Kvinsland joint-use pier. Instead, the Board stated only that "[t]he evidence was insufficient to establish that existing launching facilities were generally insufficient." CP at 39.

The Board also reiterated the City Planning Staff's assessment that the joint-use pier "was too much to expect in a rural residential environment," especially "where the owners already had use of two boat launches and buoys," CP at 38; but it failed to draw any conclusions from this assessment. Additionally, as the Board noted in its findings, the Robertson and Kvinsland families proposed a joint-use pier because it provided certain features that their existing buoys and boat ramp lacked, including a safer swimming area and wheelchair access for their older and disabled family members.
[26] The proposed pier is a shallow-area development. See Facts section of this Opinion, at page 215.
[27] The Board appears to have ignored Fish and Wildlife's assessment and Cheney's biological evaluation that the project would not harm fish habitat. The Board also impliedly concluded, without explanation, that the joint-use pier would necessarily cause harm to this unspecified "recovery" area. But the record contains no evidence that supports this conclusion.
[28] The Board's decision was also internally inconsistent with respect to eelgrass. The Board approved the SCUP to install a float lift "with the additional condition that a supplemental eel grass survey is conducted to allow placement of the float lift in a location that will not impact eelgrass." CP at 51 (emphasis added). But, despite Cheney's testimony that he detected no eelgrass near the project site, the Board denied the SDP in large part because it found that the area's eelgrass beds "were in a state of recovery."
[29] Moreover, in this appeal the Mays do not challenge the approved SCUP for the float lift.
[30] In their Statement of Additional Authorities, the Mays cite Samson v. City of Bainbridge Island to support this argument. 149 Wash.App. 33, 202 P.3d 334 (2009). But Samson involved a different type of legal challenge and a different environmental designation for the area at issue. Samson argued that the City of Bainbridge Island's amendment to its Municipal Code, prohibiting new private docks in Blakely Harbor, conflicted with the Shoreline Management Act's policy of balancing shoreline protection against shoreline development. Samson, 149 Wash.App. at 46, 202 P.3d 334. Before the amendment, the City's Municipal Code had allowed property owners to construct docks in this "semi-rural environment," which included Blakely Harbor. Samson, 149 Wash.App. at 46, 202 P.3d 334. Although the amendment did not prohibit all shoreline development in Blakely Harbor, it limited the development of new docks to two new community docks, one new public dock, and other moorage options such as buoys. Samson, 149 Wash.App. at 48, 202 P.3d 334. Noting this fact, we held that Samson failed to establish that the amendment conflicted with the Shoreline Management Act. Samson, 149 Wash.App. at 54. 202 P.3d 334.

Unlike Samson, the Robertsons and the Kvinslands challenge the Board's application of the County Code rather than an amendment. Moreover, in Samson, the "semi-rural environment" imposed different standards than the Rural Residential Environment designation at issue here, which also permits more intense shoreline development. Specifically, the semi-rural designation discussed in Samson "accommodates low to medium density residential development, low to medium intensity recreational development, passive recreation, and open space consistent with the Bainbridge Island comprehensive plan." Bainbridge Island Municipal Code 16.12.140E; Samson, 149 Wash.App. at 52, 202 P.3d 334.
Here, in contrast, the Rural Residential Environment "is an area of medium intensity land use" that allows "medium intensity residential, commercial and agricultural development." Shoreline Master Program at 16. Unlike the amendment in Samson, which restricts the number of new piers, the Rural Residential Environment designation here expressly allows residents to construct piers as part of "medium intensity" residential development. PCC 20.56. Accordingly, Samson does not advance the Mays' argument.
[31] The Mays also argue that the project's cumulative effects warrant denial of the SDP permit for the joint-use pier. Br. of Appellant at 46. They contend that (1) the Board properly exercised its authority in conducting a cumulative effects analysis, and (2) the joint-use pier's cumulative impact would detrimentally affect area residents, the surrounding environment, and precedent for future development. But, as we have already held, the Mays' arguments fail to demonstrate how the joint-use pier would detrimentally impact area residents or the shoreline's aesthetic and ecological values according to the Shoreline Management Act and other criteria applicable to this Rural Residential Environment. Nor does speculation about "cumulative effects" justify the Board's permit denial in light of (1) the Rural Residential Environment's authorization for multiple single-use 50-foot piers outright (less than $2500), and (2) the master program's general encouragement of joint-use piers. Accordingly, we do not reach this final argument.