# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| ERIC and KENDRA NIESZ, | No.  52658-1-II |
| Appellants, | |
| v. | |
| JOHN WEST, CHRISTINE WEST, WILLIAM REETZ, ERIN REETZ, | |
| Respondents, | |
| PIERCE COUNTY, STATE OF WASHINGTON SHORELINES HEARINGS BOARD, | UNPUBLISHED OPINION |
| Defendants. | |

Worswick, J. — Eric and Kendra Niesz ("the Nieszes") appeal a superior court order affirming the Washington State Shorelines Hearings Board's (Board) denial of their request for a shoreline substantial development permit (SSDP).  The Nieszes sought to construct a residential single-use dock on public tidelands in front of their waterfront property.  The Nieszes claim the Board erred in numerous ways, including by making findings of fact that were not supported by substantial evidence, by making erroneous conclusions of law, and by acting arbitrarily and capriciously.  We affirm.

## FACTS

### I.  SHORELINE DEVELOPMENT

The Nieszes own residential property located on the southwest side of Fox Island in Pierce County.  There are no private docks along the entire southwest side of Fox Island.  To the

north of the Nieszes' property there are no docks or piers for a mile and a half, and to the south, the nearest dock or pier is three miles away. The tidelands adjacent to the Nieszes' property are publicly owned through the Department of Natural Resources ("DNR"). The beach has a gradually sloping gravel surface, and a low bank or no bank. The shoreline of the Nieszes' property is improved with a two-foot eight-inch high concrete bulk head and a 96-foot long, 12-and-a-half-foot wide concrete boat ramp connecting their property to the beachfront. The Nieszes' also have a buoy and a boat lift. The shoreline connected to the Nieszes' property is located in the conservancy shoreline environment of the Shoreline Master Program for Pierce County (SMP). Respondents Erin and William Reetz own the property immediately north of the Niesz property, and respondents John and Christine West own the property immediately south of the Niesz property.

A.    *Single-Use Pier*

The Nieszes sought participation from their two neighboring property owners to join in the permit process and construction of a joint-use dock.[1] Both neighboring property owners, the Wests and the Reetzes, declined to participate. The Nieszes' nevertheless filed an application for a shoreline substantial development permit for the construction of a 154 foot (150 foot over water) long single-use dock[2] and buoy to be placed 245 feet off shore. The proposed dock would consist of a four-foot wide, 90-foot long pier with 100 percent fiberglass deck; a three-foot wide,

---

[1] A "joint use pier or dock" means, in part, "… a pier or dock … which is intended for the private, noncommercial use of not more than four waterfront building lot owners…" PCC 20.56.010(J).

[2] A "single use pier or dock" means "a dock or pier including a gangway and/or float which is intended for the private noncommercial use of one individual or family." PCC 20.56.010(I).

2

46-foot long aluminum ramp; and a 16-foot wide, 24-foot long float. Four, 8-inch diameter, galvanized steel pilings would support the float. The dock would extend from the top of the existing concrete bulkhead, approximately 12 feet south of the existing boat launch. The dock as proposed in the application did not provide for safe, convenient, and clearly available means of pedestrian access over, around, and under the dock at all tide levels.

B.       *Conservancy Shoreline Environment*

The Nieszes' proposed construction project is located within the conservancy shoreline environment of the Pierce County Shoreline Master Program of 1974. A conservancy environment designation is "designed to protect, conserve and manage existing natural resources and valuable historic and cultural areas in order to ensure continuous flow of recreational benefits to the public and to achieve sustained resource utilization." PIERCE COUNTY CODE (PCC) 20.14.010. After natural environments, a conservancy environment is the second most restrictive designation in terms of general regulations and policies governing substantial development within the Shoreline Master Program for Pierce County. *Compare* PCC 20.14, *with* PCC 20.08; 20.10; 20.12; 20.16. The policies of the SMP and water access facilities development regulations discourage development of "piers associated with single family residences" generally,[3] and the regulations and policies of a conservancy shoreline environment also provide that "areas should maintain their existing character." PCC 19D.190; PCC 18S.40.140; PCC 20.14.020.

---

[3] "Discourage [docks (piers, ramps, and/or floats)] that serve only one residence, and encourage [docks (piers, ramps, and/or floats)] serving more than on residence." PCC 18S.40.140.

In the 20 years prior to the Nieszes' application, 8 dock or pier development permits were approved and constructed within the conservancy shoreline environment of Fox Island. These docks and piers were constructed all within one clustered area of the northern side of the island known as "Bella Bella Drive." Clerk's Papers (CP) at 290. Conversely, although there are many residential developments along the approximately four miles encompassing the shoreline within the conservancy environment adjacent to the Niesz property, there are no docks or piers on the beach or tidal water. This stretch of pristine public owned land is frequently used by members of the public, including local residents and neighbors, for beach walking, kayaking, boating, and other marine and beach recreational activities.

## II. PROCEDURAL HISTORY

A.    *Permit Application*

Construction of piers and docks within a conservancy shoreline environment that exceed fifty feet in length must meet certain criteria for approval of a SSDP. PCC 20.56.030(D). The Nieszes submitted an SSDP request to the county for their dock project.[4]

---

[4] Pierce County Code defines "pier" as "a structure which abuts the shoreline and is built over the water on pilings and is used as a landing or moorage place for marine transport or for recreational purposes." PCC 20.56.010(B). The Code defines "dock" as "a structure which abuts the shoreline and floats upon the water and is used as a landing or moorage place for marine transport or for recreational purposes, but does not include recreational decks, storage facilities, or other appurtenances." PCC 20.56.010(A). A "float" is defined as "a structure comprised of a number of logs, boards, barrels, etc., fastened together into a platform capable of floating on the water, used as a landing or moorage structure for marine transport or for swimming purposes. Floats are either attached to a pier or are anchored to the bedlands so as to allow free movement up or down with the rising or falling water levels." PCC 20.56.010(C). The Nieszes project is technically an over-the-water-pier with a float. The Nieszes' project included a pier, a ramp and a float. The terms "dock" and "pier" are used interchangeably in the record. The term "dock" is generally used to describe the entire proposed project.

B.      *County Review Process*

1. *Gig Harbor Peninsula Advisory Commission*

The Nieszes presented their request for a SSDP to the Gig Harbor Peninsula Advisory Commission during a regular meeting held on April 13, 2016.  The Nieszes presented testimony in support of the application.  The Commission also heard testimony from 14 members of the public, including ten local nearby residents, all of whom testified in opposition to the proposed dock.  The Commission voted unanimously (with one abstention) to recommend denial of the application for the proposed dock and pier permit, but approval of the proposed buoy permit.  The Commission reasoned that the proposed project would impede public access to a pristine public beach and that there were already reasonable alternatives in place and should therefore be denied.

2. *Pierce County Hearings Examiner*

On September 19, 2016, the Pierce County Department of Planning and Land Services ("PALS") concluded and transmitted to the Pierce County Office of the Hearing Examiner its staff report ("Report") of the Nieszes' SSDP.  The Report recommended denial of the pier and approval of the buoy based on a review of application materials for compliance with applicable policies, codes and regulations, as well as public comments.[5]

After reviewing the Report and examining the Nieszes' application materials, the hearings examiner held a public hearing in September 2016.  The hearings examiner concluded

---

[5] "PALS received [18] comment letters . . . in opposition to the proposal, including letters from 13 Fox Island residents and one non-resident property owner.  Commenters identified concerns regarding the proposed dock negatively impacting views and boating safety, and blocking or significantly impeding public walking access along the beach."  CP at 1141.

that the Nieszes did not meet their burden to show that their proposed dock project met the SMP

criteria and satisfied the Pierce County Shoreline Management Use Regulations. The hearings

examiner therefore denied the SSDP request for the dock but conditionally approved the

installation of the buoy.

C.     *Shorelines Hearings Board*

In November 2016, the Nieszes filed an appeal of the hearings examiner's decision with

the Washington State Shorelines Hearings Board. In December 2016, the Board issued a

prehearing order setting out the legal issues governing the case and an order granting leave for

both the Wests and Reetzes to join as interveners. The legal issues governing the case before the

Board that are relevant to the instant appeal were as follows:

1.    Is the petitioner's proposal for a single use dock, approximately 154 feet long (150 feet over water) and eight foot wide, consistent with the applicable provisions of the Pierce County Shoreline Master Program, the Washington State Shoreline Management Act [of 1971 (SMA)] (90.58 RCW), Washington Administrative Code (Chapters 332-30, 461-08, 173-26, and 173-27), and any other applicable local regulations and plans?

2.    Does the fact that the proposed dock is the first proposed in a defined Stretch [sic] of Puget Sound somehow disqualify it from approval when it is a permitted use?

3.    Will the proposed dock unduly impair views taking into account that its design meets all dimensional criteria?

. . . . .

5.    Can the dock proposal be mitigated to provide safe, convenient and clearly available pedestrian access over, around and under the dock at all tide levels?

6.    Does the fact that neighbors were offered but refused a joint-use dock proposal disqualify the application for approval because it is still considered a "single-use" dock?

7.    Under the facts and circumstances, is use of the Nieszes' existing mooring buoy and boat ramp unfeasible?

8.    Where SMP policies are implemented by adopted use regulations, and those regulations permit private recreational single-use docks in the applicable shoreline designation, may those policies nevertheless be interpreted and applied such to disqualify the dock proposal from approval?

. . . .

11.   Under the facts and circumstances, are significant cumulative impacts reasonably foreseeable?

12.   Whether the SSDP should be denied based on a cumulative impact analysis utilizing the factors set forth in *De Tienne [v. Shorelines Hearings Bd.*, 197 Wn. App. 248, 391 P.3d 458 (2016),] SHB No. 13-016?

CP at 675.

The Board held a hearing on the application in September, 2017.

1. *Hearing Testimony*

a. *Testimony of Jordan Ramos*

Jordan Ramos is the Nieszes' son-in-law.  Ramos testified that although the project as presented to the hearings examiner did not comply with Department of Natural Resources regulations requiring pedestrian access over, around, or under the dock at all tide levels, the Nieszes "intend to comply with the DNR regulations" at some unspecified future time if their permit was granted.  CP at 171.[6]  Ramos testified that the Nieszes would place a sign on the ramp to the dock "to the effect of, 'Beach walkers welcome[,]'" if their permit were granted.  CP at 176.

---

[6] WAC 332-30-114(4)(d) requires all docks over state-owned tidelands be constructed in a manner that provides "a safe, convenient, and clearly available means of pedestrian access over, around, or under the dock at all tide levels."

Ramos also testified that the Nieszes sought construction of the dock in part because they wanted safe year-round mooring for their boat, and that the existing mooring buoy was inadequate for this purpose due to rough weather during the winter season. Ramos also testified that some members of the family had difficulty accessing the boat using the existing buoy because of their age. Ramos also opined that the public moorage that was available on the island was not close enough to be a reasonable alternative to the proposed dock.

b. *Testimony of Carl E. Halsan*

Carl Halsan was a real estate consultant hired by the Nieszes. Halsan testified that the Nieszes intended to comply with DNR regulations requiring access for the public in and around and over the facility at all tide levels. He also testified that a proliferation of docks on Fox Island "has happened." CP at 290. Halsan further testified that the primary reason a mooring buoy is not a reasonable alternative to a dock is because a mooring buoy is less convenient for a property owner to get to their boat than a dock.

c. *Testimony of Wendell H. Stroud*

Wendell Stroud is a marine contractor hired by the Nieszes. Stroud testified that based on the design of the proposed project, the dock would not fail due to expected storms that typically occur at the proposed site. Stroud testified that for 5 feet of clearance under the pier, a person would need to walk out "30 or 35 feet" from the edge of the property toward the water. CP at 224.

d. *Testimony of Mojgan Carlson*

Mojgan Carlson, a Pierce County planner, testified that the site is located in a conservancy shoreline environment, and that the tidelands adjacent to the site are public lands

regulated by DNR. Carlson opined that the construction of one single-use dock would encourage more construction of other single-use docks in a neighborhood. Carlson testified that the fact that there were other existing docks at the Bella Bella site was treated by the hearing examiner as precedent to permit more dock construction. Carlson also testified that even though Bella Bella was also a conservancy shoreline environment, the hearing examiner recognized that the character of the shoreline was different than his conclusions about the character at the Nieszes' site.

    e. *Testimony of Thomas D. Watkins III*

Thomas Watkins, a retired lawyer and Fox Island resident of 20 years, lives five houses north of the proposed site. Watkins testified that the beach where the proposed site is located is "[p]ristine," "[u]nobstructed," has "[c]learance to walk miles to the north or to the south" and "unlimited recreational opportunities for me and my family and my friends and the public." CP at 336. Watkins testified that the public uses the public access to walk along the beach at the site "[c]onstantly." CP at 351. Watkins testified that the proposed dock would act as a barricade to public access to the beach at the site. Watkins testified that a person standing 6 feet tall would not be able to clear the Nieszes' proposed dock unless they were to walk out 45 feet waterward. Watkins testified that there is "incredible intensity" of use of the shoreline by boaters and kayakers that "go up and down the beach, usually 10, 15, 20 feet out from the shoreline. They're not going 150 feet out." CP at 359.

Watkins testified that at the Bella Bella site, there are many docks that have existed before the SMA was enacted. Watkins testified that shoreline at the Bella Bella site is "very different" and that the Niesz site is "a pristine thing with no docks, with no need for docks,

9

where you can use—reasonably use a mooring buoy. On Bella Bella Drive, you can't do that." CP at 399. Watkins testified that because of the slope at the Bella Bella site, the beach is not walkable, and that "it's very difficult to have access to a boat without a dock." CP at 386.

Watkins further testified that, in contrast to the Bella Bella site, the Niesz site accommodates boaters driving their boats right up to the shore to load and unload passengers. He further testified that he had "never heard a complaint about the usability and the reasonableness of a mooring buoy," and that it was the favored method of everyone on the western side of the island, in contrast to the Bella Bella side where a mooring buoy was untenable and a dock was required. CP at 386.

Watkins testified that the south side of the island where the Nieszes planned to install their dock was visited by frequent and severe winter storms with "50-knot winds" and "waves [that] get extremely high." CP at 402. Watkins testified that for mooring boats in the winter, "[m]ost people don't. The winter is very windy, a lot of waves, a lot of storms, cold. People don't boat in the Winter normally, unless you're a dyed-in-the-wool fisherman." CP at 401. Watkins, when asked hypothetically if he had a pier similar to the Niesz proposed pier if he would leave his boat in the water during the winter, testified "[a]bsolutely not. [T]here's a reason for that, and it's a scientific reason. The storms we have in the Winter, the waves we have, the winds we have, the boat would be damaged or destroyed were that to happen. No one, no one does that." CP at 402. He further testified that "[he was] not aware of anybody that really goes out in a boat in the wintertime . . . the Niesz[e]s do not use their boat other than unusually, infrequent times . . . they would never do that in the Winter . . . they would not dare leave their boat tied up in the float on the pier." CP at 402-03.

f. *Testimony of John D. West*

West, a 40-year resident of Fox Island and immediate neighbor to the south of the Nieszes, testified that the Nieszes asked him whether he wanted to join them to construct a joint-use dock, and that he declined. West testified that he uses the same buoy and dinghy method that the Nieszes use to retrieve and use his boat. When asked if there were any limitations from this method for use of his boat, West testified, "No, none whatsoever." CP at 411. West also testified that there had been no recorded drownings or injuries from anyone of the numerous residents and their young children on the island using this method.

West testified that the public, as well as he and his family, frequently walk along the beach at the proposed site. West testified that the area is frequented by kayakers and other members of the public engaging in near shore marine recreation, including wakeboarders, swimmers, water skiers, and others.

g. *Testimony of Erin Dugger Reetz*

Reetz is a resident since 2016 and immediate neighbor to the north of the Nieszes. Reetz testified that her family used the buoy and dinghy method, consistent with the Nieszes, to retrieve and use their boat. Reetz further testified that neither she nor her children ever had any difficulties boarding the boat in this manner. Reetz testified that she found no inconvenience with using the buoy method to moor and retrieve her boat.

Reetz testified that the beach at the Bella Bella site was sandier, steeper, and less walkable than the Nieszes' site. Reetz stated that the Bella Bella site was "unpleasant" to visit because of "it's succession of piers and docks . . . it feels like barriers to [beach walking] forward." CP at 462.

h. *Testimony of Matt Heim*

Heim, a Fox Island resident of two and a half years, lives four houses to the west of the Nieszes. Heim testified that the commute to the Narrows Marina is "10- to 15-minute[s]." CP at 465. Heim testified that he uses a mooring buoy and dinghy method for storing and retrieving his boat. Heim testified that his three young children are all able to access his boats using this method. Heim testified that even as an avid boater, he does not boat during the winter because there is frequent "big water," inclement and dangerous weather, and the sport fishing seasons are closed. CP at 468. Heim testified that he cannot safely moor his boat year-round due to weather.

Heim testified that if the Nieszes' dock were constructed, it would "change[] the use for everybody, for little kids, for people that park their cars, for people that like to walk their dogs, to kids that go stroll around for something to do." CP at 471. Heim also testified that the proposed dock would provide a "psychological barrier" for people who did not want to trespass to use the beach, because they would be prevented from crossing the dock without trespassing onto the Nieszes' property. CP at 471. Heim testified that the proposed dock would change the character of the beach from "what the beach is for, the public versus one person's desire to have something that . . . might seem to be a bit of a luxury item." CP at 471. Heim further testified that a dock was incompatible with the way the public and neighbors used the beach.

Heim testified that the proposed dock would be a physical barrier for beach walkers that would require them to walk out into the water to pass by, including children having to walk out into potentially dangerous conditions. Heim testified, when asked about the necessity of a dock on the western side of the island, that

> [p]lenty of people have enjoyed it for a hundred years on that side of the island. There's never been a pier because there isn't a need for it. We don't have a beach

that requires it to pass muddy and mucky surfaces, to use your boat and extend the day, let alone the season. We have access to this place pretty much whenever we want in the current use model that it has. So no, I don't think that there's a need for it. I can see that it's a desirable thing to have and potentially creates joy for them, but I don't think at the expense of all of the countless number of people that come up and down that beach daily.

CP at 474.

### 2. *Board's decision, findings of fact, and conclusions of law*

In addition to its evaluation of the relevant laws, rules, and regulations, the Board conducted a cumulative impacts assessment under *Garrison v. Pierce County* (*De Tienne*) SHB 13-016c (January 22, 2014), *aff'd De Tienne*, 197 Wn. App. 248 (2016). The Board used the following factors from *Garrison*, SHB 13-016 at 54-55:

1. Whether a shoreline of statewide significance is involved;
2. Whether there is potential harm to habitat, loss of community use, or a significant degradation of views and aesthetic values;
3. Whether a project would be a "first of its kind" in the area;
4. Whether there is some indication of additional applications for similar activities in the area;
5. Whether the local SMP requires a cumulative impacts analysis be completed prior to approval of an SSDP;
6. The type of use being proposed, and whether it is a favored or disfavored use.

The Board concluded that the Nieszes failed to demonstrate that the proposed dock was consistent with the SMA and the County SMP and upheld the hearing examiner's decision to deny the Nieszes' request for a SSDP for the proposed dock. The Board also found there would be impermissible cumulative impacts from the proposed dock. The Board made 37 findings of fact and 34 conclusions of law. Of those findings and conclusions, the following are contested and at issue in this appeal:

a. Findings of Fact:

    ii. The proposed dock is a "single-use" facility (finding of fact (FF) 4)
    iii. The proposed dock would impair or restrict beach walkers (FF 17)
    iv. The proposed dock will impair nearshore marine recreation in the form of kayaking, paddle boarding, swimming and boating (FF 17)
    v. The Narrows Marina is a reasonable alternative (FF 22)
    vi. A mooring buoy is a reasonable alternative (FF 23)
    vii. Year-round use of the dock would be unsafe (FF 24)
    viii. The dock would not significantly increase the boating season (FF 24)

b. Conclusions of Law:

    i. The Pierce County Superior Court decision denying the SSDP is affirmed
    ii. The dock proposal is not consistent with the SMP and SMA policies (Conclusions of Law (CL) 2; 15-31; 33)
    iii. The proposed dock is not compatible with the surrounding land and water uses and the proposed dock is not consistent with existing pier density (CL 23; 31)
    iv. Approval of an SSDP for the proposed dock in this location would likely have cumulative impacts that would be inconsistent with the policies and regulations of the SMP (CL 30)
    v. The proposal would lead to more dock applications which would degrade the aesthetic quality of the beach (CL 28-30)
    vi. SMP policies and SMP regulations are considered together (CL 9)
    vii. Reasonable alternatives to the proposed dock are available (CL 19-21; 26)
    viii. The proposed dock would impair or restrict beach walkers (CL 15; 17; 23)

CP at 30-55.

D. *Pierce County Superior Court*

The Nieszes filed a petition to the superior court for judicial review, under RCW 34.05.570 and WAC 461-08-570, challenging the decision of the Board. In October 2018, the Pierce County superior court denied the petition for judicial review and affirmed the decision of the Board.

14

No. 52658-1-II

The Nieszes appeal the superior court's decision affirming the Board's denial of their SSDP application.

## ANALYSIS

### I. STANDARD OF REVIEW

We review the Board's decision under the Administrative Procedure Act, chapter 34.05 RCW. RCW 90.58.180(3). We review the Board's decision, not the decision of the local government or the superior court, limiting our review to the record before the Board. *Buechel v. Dep't of Ecology*, 125 Wn.2d 196, 202, 884 P.2d 910 (1994). The party appealing the Board's decision bears the burden of demonstrating the invalidity of the Board's actions. *Preserve Our Islands v. Shorelines Hearings Bd.*, 133 Wn. App. 503, 515, 133 P3d 31, 137 P.3d 31 (2006).

The Board's decision may be overturned by the reviewing court under the bases found in RCW 34.05.570(3), including (1) erroneous interpretation or application of the law, (2) lack of substantial evidence, and (3) arbitrary or capricious action. Generally, an issue not raised before the Board may not be raised for the first time on review. *Buechel*, 125 Wn.2d at 201 n.4.

We review the Board's interpretation of the SMA and local government shoreline regulations *de novo* because they involve questions of law. *Preserve Our Islands*, 133 Wn. App. at 515. The interpretation of a master program provision is also a question of law. *Jefferson County v. Seattle Yacht Club*, 73 Wn. App. 576, 589, 870 P.2d 987, *review denied*, 124 Wn.2d 1029 (1994). We generally accord deference to an agency's legal conclusions; however, we are not bound by them. *Puget Sound Water Quality Def. v. Municipality of Metro. Seattle*, 59 Wn. App. 613, 617, 800 P.2d 387 (1990). We "give due deference to the Board's specialized knowledge and expertise, unless there is a compelling indication that the agency's regulatory

15

interpretation conflicts with the legislature's intent or exceeds agency's authority." *Samson v. Bainbridge*, 149 Wn. App. 33, 43, 202 P.3d 334 (2009). Likewise, when necessary to ensure that a proposed project complies with the SMA, we may substitute our own judgment for an agency's legal determinations. *Seattle Yacht Club*, 73 Wn. App. at 589.

We review a decision based on the record before the Board. *Frank Coluccio Constr. Co. v. Dep't of Labor & Indus.*, 181 Wn. App. 25, 35, 329 P.3d 91 (2014). We apply the substantial evidence review standard to challenges to the Board's findings under RCW 34.05.570(3)(e), viewing the evidence in the light most favorable to the party which prevailed in the highest forum that exercised fact-finding authority, and giving deference to the Board's factual findings. *Olympic Stewardship Found. v. State Envtl. & Land Use Hearings Office through W. Wash. Growth Mgmt. Hearings Bd.*, 199 Wn. App. 668, 686, 399 P.3d 562 (2017). We review the whole record before the Board. RCW 34.05.570(3)(e). A finding is supported by substantial evidence when "it would convince an unprejudiced, thinking mind of the truth of the declared premise." *Seattle Yacht Club*, 73 Wn. App. at 588. We do not disturb the Board's judgment regarding weight of evidence and questions of credibility. *Stericycle of Washington Inc. v. Wash. Utilities & Transp. Comm'n*, 190 Wn. App. 74, 89, 359 P.3d 894 (2015). A decision made by the Board is "clearly erroneous" when, in light of the entire record and the policies contained in the SMA, we are "definitely and firmly convinced that a mistake has been made." *Buechel*, 125 Wn.2d at 202; *see* RCW 34.05.570(3)(e).

When reviewing the Board's decision for arbitrary or capricious conduct, we ask whether the decision demonstrated "willful and unreasoning action in disregard of facts and circumstances." *Buechel*, 125 Wn.2d at 202(quoting *Skagit County v. Dep't of Ecology*, 93

16

No. 52658-1-II

Wn.2d 742, 749, 613 P.2d 115 (1980)). A decision is not arbitrary or capricious if it is based on honest and due consideration, even if a different conclusion could have been reached. *Buechel*, 125 Wn.2d at 202.

## II. APPLICABLE LAWS AND REGULATIONS

A.      *State Shoreline Management Act*

The Washington Shoreline Management Act of 1971 was enacted and codified under chapter 90.58 RCW in order to meet "a clear and urgent demand for a planned, rational, and concerted effort, jointly performed by federal, state, and local governments, to prevent the inherent harm in an uncoordinated and piecemeal development of the state's shorelines." RCW 90.58.020. Accordingly, the SMA requires local governments to develop a master program to regulate shoreline uses consistently with its guidelines. RCW 90.58.080(1). Local governments must give preference to certain uses when crafting their SMP; listed below are the preferences of uses in order of high to low priority:

> (1)      Recognize and protect the statewide interest over local interest;
> (2)      Preserve the natural character of the shoreline;
> (3)      Result in long term over short term benefit;
> (4)      Protect the resources and ecology of the shoreline;
> (5)      Increase public access to publicly owned areas of the shorelines;
> (6)      Increase recreational opportunities for the public in the shoreline;
> (7)      Provide for any other element as defined in RCW 90.58.100 deemed appropriate or necessary.

 RCW 90.58.020.

The legislature's use preference for the shorelines of the state is found in RCW 90.58.020, and provides that:

> Alterations of the natural condition of the shorelines of the state, in those limited instances when authorized, shall be given priority for single-family residences and their appurtenant structures, ports, shoreline recreational uses including but not

17

limited to parks, marinas, piers, and other improvements facilitating public access to shorelines of the state, industrial and commercial developments which are particularly dependent on their location on or use of the shorelines of the state and other development that will provide an opportunity for substantial numbers of the people to enjoy the shorelines of the state.

Shoreline development in Washington must be consistent with the SMA and local government's corresponding shoreline master programs. RCW 90.58.140(1). The Washington Administrative Code sets forth the following criteria to guide an agency's review of a substantial development permit:

(1) A substantial development permit shall be granted only when the development proposed is consistent with:
    (a)  The policies and procedures of the act;
    (b)  The provisions of this regulation; and
    (c)  The applicable master program adopted or approved for the area.
    (2)  Local government may attach conditions to the approval of permits as necessary to assure consistency of the project with the act and the local master program.

WAC 173-27-150.

B.    *County Shoreline Master Program*

The Shoreline Master Program for Pierce County, adopted in 1974, directs the County to consider certain goals, policies and use regulations in its land use management actions. The County Shoreline Master Program lists "piers" as a regulated "use activity," and provides:

(a)   Piers in conjunction with marina development in appropriate areas should be allowed.
(b) Piers in conjunction with recreational development in appropriate areas should be allowed, Consideration should be given to size and intensity of uses in relation to adjacent shoreline uses.
. . . .
(d)   Piers associated with single family residences should be discouraged.
(e)   In considering any pier, considerations such as environmental impact, navigational impact; existing pier density, parking availability, and impact on adjacent proximate land ownership should be considered.

    (f)    Encourage the use of mooring buoys as an alternative to space-consuming piers such as those in front of single family residences.

. . . .

    (l)    The use of floating docks should be encouraged in those areas where scenic values are high and where conflicts with recreational boaters and fishermen will not be created.

. . . .

    (n)    Priority should be given to the use of community piers and docks in all new major waterfront subdivisions. In general, encouragement should be given to the cooperative use of piers and docks.

Br. of Appellant (App. 3, at 2 (Shoreline Master Program)).

C.    *County Shoreline Regulations*

In order to implement the goals and policies of the Shoreline Master Program for Pierce County, the County codified its Shoreline Management Use Regulations under Title 20 of the Pierce County Code. The purpose of the Shoreline Management Use Regulations is to "promote and enhance the best interest of the general public" by "promot[ing] intensities and qualities of development consistent with the protection of the shoreline environment and its related resources and policy of the Shoreline Management Act of 1971." PCC 20.02.010.

The Shoreline Management Use Regulations designate different environment types to different categories of land "as a mechanism for applying appropriate land and water use policies and regulations to distinctively different shoreline areas." PCC 20.06.010. Environment designations "encourage[] uses which enhance the character of the environment and at the same time place[] reasonable standards and restrictions on developments which might disrupt the character of the environment," and are chosen based on the "existing development pattern, the biophysical limitations and capabilities of the shoreline area, and the goals and aspirations of the citizens." PCC 20.06.010.

There are five listed designations in the Shoreline Management Use Regulations, listed in descending order from highest to lowest permissible intensity: Urban, Rural-Residential, Rural, Conservancy, and Natural. Chapter 20 PCC. The lower the intensity, the higher the standards and restrictions designed to maintain the existing character. The conservancy environment, on the lower end of the intensity spectrum and higher end of the standards and restrictions for development, is designed to "protect, conserve and manage existing natural resources . . . to ensure a continuous flow of recreational benefits to the public . . . ." PCC 20.14.010. Policy and regulations guide that conservancy shorelines "should maintain their existing character" and only "[s]ubstantial and non-substantial developments which do not lead to significant alterations of the existing natural character of an area should be encouraged." PCC 20.14.020. The preferred uses for conservancy shorelines are outdoor recreation activities, commercial timber harvesting, and passive agricultural uses (pasture and range lands). PCC 20.14.030.

The Code includes the following "General Criteria and Guidelines for Reviewing Substantial Development Permits" that the county may extend, restrict, or deny an application to achieve:

(1) Important navigational routes or marine oriented recreation areas will not be obstructed or impaired;
(2) Views from surrounding properties will not be unduly impaired;
(3) Ingress–Egress as well as the use and enjoyment of the water or beach on adjoining property is not unduly restricted or impaired;
(4) Public use of surface waters below ordinary high water shall not be unduly impaired;
(5) A reasonable alternative such as joint use, commercial or public moorage facilities does not exist or is not likely to exist in the near future;
(6) The use or uses of any proposed dock, pier or float requires, by common and acceptable practice, a Shoreline location in order to unction;

(7) The intensity of the use or uses of any proposed dock, pier, and/or float shall be compatible with the surrounding environment and land and water uses.

PCC 20.56.040.

Under the "Piers and Docks" section of the Shoreline Management Use Regulations, Pierce County states its intent for regulating substantial development of shorelines vis-a-vis piers and docks:

> It is the intent of Pierce County to encourage the construction of joint use or community use docks and piers whenever feasible so as to lessen the number of structures projecting into the water. To this end, waterfront property owners are encouraged to explore the advantages of increased dock dimensions which are afforded by the construction of a joint or community use structure.

PCC 20.56.020.

A "joint use pier or dock" means a " a pier or dock . . . which is intended for the private, noncommercial use of not more than four waterfront building lot owners," while a "single use pier or dock" means "a dock or pier including a gangway and/or float which is intended for the private noncommercial use of one individual or family." PCC 20.56.010(I)(J).

### III. COMPLIANCE

A. *Consistency with Shoreline Management Act*

1. *Single-Use Designation*

The Nieszes argue that the Board erred in finding that their dock project was "single-use." Br. of Appellant at 25. We disagree.

The Nieszes specifically argue that because they sought the participation of their neighbors (the same neighbors who now appear as respondents), and because their neighbors declined, that the Board therefore erred when it deemed their project to be "joint-use" for purposes of the permitting process, notwithstanding that they themselves captioned the project as

"single-use" on their own application. Br. of Appellant at 19. This argument contradicts the plain meaning of the regulations defining joint-use and single-use. The Nieszes provide no doctrinal justification for why the Board or this court should credit the Nieszes with the benefits of a designation designed to encourage increased public access to shorelines just because they merely asked their neighbors to participate in the permitting process.

The Nieszes also argue that their pier "by law is joint use" because "[w]hen another waterfront owner wishes to use the dock, the Nieszes must allow them to do so per the DNR regulation." Br. of Appellant at 25. This argument fails because it has no basis in law, and it is also misleading. WAC 332-30-144(4)(d) provides, "Owners of docks located on state-owned tidelands or shorelands must provide a safe, convenient, and clearly available means of pedestrian access over, around, or under the dock at all tide levels. **However, dock owners are not required to allow public use of their docks or access across private lands to state-owned aquatic lands**." (Emphasis added.) This regulation does not convert the Nieszes' dock to joint-use.

The finding of fact that the pier was single-use turns on whether the Nieszes intended the pier for their own private noncommercial use. PCC 20.56.010(I). The Board found that they did, and that finding was supported by substantial evidence. First, the Nieszes characterized the project as "[r]esidential single-use dock [and] buoy" in their application. CP at 581. Second, Ramos testified that the pier's purpose was to extend their family's boating season, to provide safe mooring for their personal boat, and to give safer and more convenient access for their family's personal recreation.

22

Although the Nieszes point to the fact that they sought participation from their two neighboring property owners to join in the permit process, this court considers the whole record. RCW 34.05.570(3)(e). Based on Ramos's testimony and the Nieszes' application describing the pier as "single use," we hold that there is substantial evidence to show that the project was for a single-use pier.

The Nieszes further argue that the Board erred in concluding that a single-use pier is not a preferred use under the policies of the SMA. We disagree.

We give deference to an agency's interpretations unless they are clearly erroneous or in conflict with the purpose and intent of the SMA, which gives primacy to increased public access to shorelines. RCW 90.58.020. This court broadly construes the SMA in order to protect the state shorelines as fully as possible. *Buechel v. Department of Ecology*, 125 Wn.2d 196, 203 (1994).

In *Samson v. City of Bainbridge*, we noted that piers are listed as a preferred use but only insofar as they are an improvement facilitating public access to shorelines. 149 Wn. App at 51. In that decision, we deferred to the Board, which concluded that the legislature did not intend any special preference be made to private docks. *See also*, *Spencer v. City of Bainbridge Island*, No. 97-43, at 9 (Wash. Shorelines Hr'gs Bd. Feb. 5, 1998) ("We conclude that the Legislature purposefully distinguished between public and private piers and did not apply any particular preference to the latter, which would limit public access in, rather than promote public access to the waters of the state."). The Board's similar interpretation in the instant case is not in conflict with the purpose and intent of the SMA. Each of the improvements in the SMA's use preference list is associated through "facilitating public access to shorelines of the state." RCW 90.58.020.

Since a private, single-use pier is restrictive in terms of public access, it follows that the legislature's "priority" would not include such a pier as a preferred use. We hold that the Board did not error in concluding that the single-use pier is not a preferred use under the policies of the SMA.[7]

B.      *Consistency with Pierce County Policies and Regulations*

   1. *Obstruction or Impairment of Marine Oriented Recreation Areas*

The Nieszes argue that the Board erred in ruling that marine oriented recreation areas will be obstructed and impaired by the proposed dock. We disagree. The Nieszes assign error to the findings of fact and conclusions of law pertaining to the public's ability to recreate on the beach and water free from obstruction or impairment. These arguments fail.

First, the Nieszes argue that the board misinterpreted the criteria by not correctly applying the preposition modifier "important" to both nouns in the series, including "navigational routes" and "marine-oriented recreational area[s]." Br. of Appellant at 29. They argue that the proper construction of "important" as applied to "marine recreation activities" would have excluded the public lands in question from consideration.[8] They argue that because the record is "devoid of proof of any marine park designation or public boat launch at the Site or

---

[7] The Nieszes also argue that "[t]he Board considered a dock as a disfavored use, a perspective which erroneously permeated its decision." Reply Br. of Appellant at 3. The word "disfavored" only appears within the cumulative impact analysis criteria cited from *Garrison v. Pierce County* (*De Tienne*) SHB 13-016c (January 22, 2014), *aff'd*, *De Tienne*, 197 Wn. App. at 248. In conclusion 30, the Board concluded that the Nieszes' single-use dock is discouraged under the SMP Piers Policies; "(d) Piers associated with single family residences should be discouraged." Br. of Appellant (App. 3, at 2, (Shoreline Management Program)).

[8] PCC 20.56.020A provides, "Important navigational routes or marine oriented recreation areas will not be obstructed or impaired."

in the general vicinity[,]" that there was no obstruction or impairment of marine oriented recreation areas. Br. of Appellant at 30. But the construction advocated by the Nieszes, that a marine oriented recreation activity area is only "important" if it is a fixture such as a public boat ramp or a designated park, frustrates the purpose of the Code in implementing the preferred uses promulgated by the SMA. PCC 20.02.010; RCW 90.58.020. We favor an interpretation of the SMA that furthers rather than obstructs the document's purpose. The legislature plainly gave preference to "increas[ing] public access to *publicly owned areas of the shorelines*" and "increas[ing] recreational opportunities for the *public* in the shoreline" when they mandated that Pierce County adopt its regulations. RCW 90.58.020 (emphasis added). The shoreline in question is publicly owned.

The Nieszes argue that the SMA[9] places an "as far as . . . practical" condition on what level of obstruction or impairment must be avoided under the County's criteria. Br. of Appellant at 30. The Board concluded that because of the low height of the dock, beach walkers, swimmers, and boaters would not be able to traverse the dock, which constituted an "obstruction or impairment." We decline to second guess the Board's interpretation of "obstruction or impairment" from the Code. We also find substantial evidence in the record before the Board to support the finding that there was obstruction and impairment.

The Nieszes preferred interpretation of the criterion in question would require us to read into the text what is not otherwise plainly said or reasonably implied. Where the plain language

---

[9] RCW 90.58.020 provides, in part, "Permitted uses in the shorelines of the state shall be designed and conducted in a manner to minimize, insofar as practical, any resultant damage to the ecology and environment of the shoreline area and any interference with the public's use of the water."

of a statute is unambiguous, and legislative intent is therefore apparent, we will not construe the statute otherwise. However, plain meaning may be gleaned from all that the Legislature has said in the statute and "related statutes which disclose legislative intent about the provision in question." *Ellensburg Cement Products, Inc. v. Kittitas Cty.*, 179 Wn.2d 737, 743, 317 P.3d 1037 (2014) (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002)). The same principles apply to interpretation of local government ordinances, like the Pierce County Code here. *City of Spokane v. Fischer*, 110 Wn.2d 541, 542, 754 P.2d 1241 (1988). Although we broadly construe the SMA, we only do so to protect the state shorelines as fully as possible. *Buechel*, 125 Wn.2d at 203. We find no deviation from the intent of the SMA that would compel us to overcome the deference owed to the Board here. *Samson*, 149 Wn. App. at 43. We therefore hold that the Board did not err in interpreting this criterion.

The Nieszes also argue that sufficient evidence does not support the finding that marine oriented recreation areas would be obstructed or impaired. However, Ramos conceded at the hearing that the dock project as proposed would not satisfy the requisite DNR regulations against obstruction or impairment of beach-going pedestrians, but that they planned to comply at a yet specified time in the future. The Nieszes' other witness, Stroud, also testified that the tide would need to be out 35-feet waterward of the bulkhead for a person of 5 feet in height to cross underneath the dock unimpeded. Watkins similarly testified that a person of 6 feet in height would need to walk out 45 feet. We hold that substantial evidence supports the finding of obstruction or impairment of marine oriented recreation areas.

Finally, the Nieszes now argue in their brief that compliance with that DNR regulation requiring passage over the dock would be "a simple matter involving erection of a small four- or

26

five-step set of stairs." Br. of Appellant at 32. That the Nieszes may one day in the future comply with DNR regulations has no bearing on the Board's determination for this criterion, and the Nieszes offer no compelling argument otherwise. The Nieszes' offer to provide for additional conditions on the permit did not alter the duty of the Board to rule on the specific permit before it, which did not contain such conditions. *Hayes v Yount*, 87 Wn.2d 280, 291, 552 P.2d 1038 (1976). We decline to interfere with the sound discretion of the Board in determining what constitutes a sufficient degree of "obstruction or impairment" under this criterion.

Testimony at the hearing showed that the public's ability to use the beach and the water would be obstructed by the dock. We hold that the Board did not err in ruling that marine oriented recreation areas will be obstructed or impaired by the proposed dock, because the Board's interpretation of "obstruction" and "impairment" was not clearly erroneous, and the finding made by the Board that amounted to a sufficient degree of "obstruction or impairment" was supported by substantial evidence.

    2. *Ingress-Egress as well as the use and enjoyment of the water or beach on adjoining property is unduly restricted or impaired*

The Nieszes argue that the Board erred in ruling that there would be undue restriction and impairment as to the use of the beach on adjoining properties. The Nieszes assign error to both the findings of fact and conclusions of law related to this criterion. The Nieszes argue that the Board's interpretation of the criteria was clearly erroneous, and that the findings of fact supporting its legal conclusion was not supported by substantial evidence. We disagree.

First, the Nieszes contend that the Board erred in interpreting the code by "finding language not set forth in the governing ordinance and misapplying it beyond the immediately adjacent properties." Br. of Appellant at 29. The Nieszes argue that because "[n]o witness

testified that the dock would prevent the opposing neighbors from using their own beaches or launching any watercraft from their properties, that substantial evidence does not support the finding. Br. of Appellant at 29. The Nieszes seem to argue that this criterion is meant only to protect the boundary of adjoining properties insofar as they touch the shoreline. PCC 20.56.040(A)(3) provides that "Ingress-Egress as well as the use and enjoyment of the water or beach on adjoining property is not unduly restricted or impaired." The Board interpreted the Code to mean that since "the distance between the bottom of the pier and the beach will prevent the adjoining property owners from walking along the beach at many tides," this was sufficient to be deemed "undue restriction or impairment." CP at 49. This interpretation is not clearly erroneous.

The Nieszes proposed interpretation of "undue restriction or impairment" would necessarily only apply insofar as a neighbor cannot cross the boundary of their adjoining property onto the beach or water, and would render the first element of this two-part conjunctive criterion ("Ingress-Egress as well as . . .") to be superfluous. The Nieszes' interpretation offends the well-established surplusage canon of statutory construction, which holds that "[the court] must interpret a statute so as to render no portion meaningless or superfluous." *State v Dennis III*, 191 Wn.2d 169, 173, 421 P.3d 944 (2018) (internal quotation marks omitted). We decline to interfere with the Board's due deference in interpreting this language because there is no compelling reason to do so. We hold that there was no clear error in how the Board interpreted "undue restriction or impairment" from this criterion.

As discussed above for criteria one, the Board reasoned that the dock would obstruct the use and enjoyment of the beach because the dock would obstruct beach walkers, swimmers and

the use of small water craft. The same evidence sufficient to substantiate the finding that the public would be unable to walk and enjoy the beach and water crossed by the proposed pier and dock applies equally to the finding that the neighbors also would suffer the same consequence. West testified that the nearby residents walk along the beach at the proposed site in the same manner that the public does. The Board therefore did not err in finding that there would be undue restriction or impairment because such finding was supported by substantial evidence. The legal conclusion that the neighbors would face undue restriction and impairment as to the use and enjoyment of the beach directly adjacent to their properties falls squarely within the language of the Code. The Nieszes have failed to carry their burden to show the Board erred in this conclusion. Therefore, we hold that the Board did not err in ruling that there would be undue restriction and impairment as to the use of the beach on adjoining properties.

> 3. *A reasonable alternative such as joint use, commercial or public moorage facilities does exist or is likely to exist in the near future*

The Nieszes argue that the Board erred in ruling that reasonable alternatives exist. We disagree.

The Nieszes challenge the conclusion that the existing mooring buoy is a reasonable alternative. The Nieszes also challenge the findings of fact that (1) the character of the beach makes loading and unloading boats reasonably manageable, and (2) the dock would not significantly extend the boating season. These arguments fail.

West testified that he uses the same buoy and dinghy method that the Nieszes use to retrieve and use his boat. He testified that there were no limitations from mooring his boat on the buoy. West also testified that there had been no recorded drownings or injuries from anyone of the numerous residents and their young children on the island using this method.

Reetz testified that her family used the buoy and dinghy method consistent with the Nieszes' to retrieve and use their boat. Reetz further testified that neither she nor her children ever had any difficulties boarding the boat in this manner.

Watkins explained that the residents on the south side of the island stored their boats during the winter because the south side of the island experienced frequent and severe winter storms with "50-knot winds" and "waves [that] get extremely high." CP at 402. He further testified that "[he was] not aware of anybody that really goes out in a boat in the wintertime . . . the Nieszes do not use their boat other than unusually, infrequent times . . . they would never do that during the winter . . . they would not dare leave their boat tied up in the float on the pier." CP at 402-03. Reetz also testified that he did not boat in the winter and stored his boat at a public marina because of rough weather.

The testimony received by the Board at the hearing was sufficient to find that loading and unloading boats via the buoy and dinghy method was manageable, and that the proposed dock would not extend the boating season. Part F of the SMP pier policy implores the County to develop use regulations that "[e]ncourage the use of mooring buoys as an alternative to space-consuming piers such as those in front of single-family residences." Br. of Appellant (App. 3, at 2 (Shoreline Master Program)). The Board's legal conclusion is in keeping with this policy. The Board's legal conclusion regarding the reasonableness of a buoy as an alternative was not erroneous, capricious, or arbitrary.

30

4. *The intensity of the use or uses of any proposed dock, pier, and/or float shall be compatible with the surrounding environment and land and water uses*

The Nieszes argue that the Board erred in concluding that the intensity of use of the proposed project would not be compatible with the surrounding environment and land and water uses. We disagree.

The Nieszes argue specifically that "intensity" from the criteria in question and "existing pier density" from Part E of the SMP pier policy are both meant only to prevent overcrowding. Br. of Appellant at 28. The Nieszes argue that the Board is effectively implementing a *de facto* ban any new dock in an area with no or very few docks present if it reads the criteria another way. The Nieszes point to *May v. Robertson*, 153 Wn. App. 57, 87, 218 P. 3d 211 (2009) to support the proposition that an agency cannot consider if a dock is the first of its kind on a shoreline when evaluating an SSDP application. The Nieszes also assert, without authority, that the Board cannot consider the SMP pier policy because the specific regulations of PCC 20.56.040 control over the general policies. These arguments fail.

The Board found that the existing pier density for this stretch of public tidal lands in question was zero. The Board concluded that the proposed single-use pier (and its intensity of use) would be inconsistent with the current surrounding environment and land and water uses. At the same time, the Board says that "the absence of docks is not determinative of the decision on whether the intensity of use is compatible or whether a dock would be inconsistent with existing pier density." CP at 52. The Board resolves this apparent conflict in its logic:

> In light of the specific impacts of the dock proposed by the Nieszes and the County's policy of discouraging single-use docks, the Board concludes that the intensity of use concerning the proposed dock is not compatible with the surrounding land and water uses and the proposed dock is not consistent with existing pier density. The Board is not ruling that all docks are prohibited along

31

the southwest side of Fox Island. Although the proposed dock would not be compatible with the land and water uses in the area or the existing pier density, other docks may not have the impacts of the proposed dock or the reasonable alternative of the proposed dock.

CP at 53.

By its reasoning, the Board leaves open the possibility that other proposed docks could have passed this criterion. The Board found that the proposed dock had incompatible intensity because of how much public use of the land and water the proposed project would impede and obstruct versus how much public land and water use the Nieszes' project would keep exclusively for the Nieszes. That monopolization of so much public use of land and water is the character of intensity that stands in stark contrast to the pristine and open existing land and water available to the public that would otherwise be unrestricted and impeded. The fact that there are no other docks in the area does amplify this contrast, but the restrictive and impeding nature of the proposed dock is ultimately what is dispositive here, based on the reasoning of the Board. The Board did not outright ban any new dock on this stretch of beach, but it did consider this particular proposed dock to be incompatible compared to the existing public use. The Board's reasoning suggests that had the Nieszes designed a less restrictive and less obstructive dock, or perhaps had that dock been joint-use, then perhaps the outcome may have been different for this criterion.

The Nieszes point to *May v. Robertson*, 153 Wn. App. 57, as their primary authority for why their permit cannot be denied on the ground that it is the first dock in the area. In *May v. Robertson*, we reversed the Board's decision to deny a permit for a joint-use pier to be constructed in a rural residential environment shoreline. 153 Wn. App. at 93. We reasoned in part that a denial merely because the permit was for the "first [pier] within [that] sandy crescent"

was not proper. *May*, 153 Wn. App. at 88 (first alteration in original). We held that substantial evidence failed to support the Board's conclusion that the joint-use pier would be incompatible with the surrounding land and water used because "the joint-use pier is consistent with and advances this shoreline environment's planned uses." *May*, 153 Wn. App. at 87. But the facts of *May* are distinguishable from the instant case. Here, the Board correctly found that the Nieszes' single-use pier would be inconsistent with and would not advance the conservancy environment shorelines planned uses when the Board found that the pier would obstruct and impair public access to the beach.[10] A rural residential environment shoreline is more permissive of intensity of use than a conservancy environment, which guides that "areas should maintain their existing character," since they are "designed to protect, conserve, and manage existing natural resources . . . in order to *ensure a continuous flow of recreational benefits to the public . . . .*" PCC 20.14.010, .020(A) (emphasis added).

We hold that the Board did not err in concluding that the intensity of the use or uses of the Nieszes' proposed project was incompatible with the surrounding environment and land and water uses.

C. *Cumulative Impacts*

The Nieszes argue that no facts or law support the Board's cumulative impacts ruling. We disagree.

The Board conducted a cumulative impacts assessment under *Garrison v. Pierce County* (*De Tienne*), No. 13-016c, (Wash. Shorelines Hr'gs Bd. Jan. 22, 2014), *aff'd*, *De Tienne*, 197

---

[10] "Outdoor recreation activities" are a "preferred use" of aconservancy environment. PCC 20.14.030.

No. 52658-1-II

Wn. App. 248 (2016). The Board used the following factors from *Garrison*, SHB 13-016 at 54-55:

> 1. Whether a shoreline of statewide significance is involved;
> 2. Whether there is potential harm to habitat, loss of community use, or a significant degradation of views and aesthetic values;
> 3. Whether a project would be a "first of its kind" in the area;
> 4. Whether there is some indication of additional applications for similar activities in the area;
> 5. Whether the local SMP requires a cumulative impacts analysis be completed prior to approval of an SSDP;
> 6. The type of use being proposed, and whether it is a favored or disfavored use.

CP at 21-22.

The Board concluded that the proposed single-use dock is discouraged under the SMP Piers Policies. This conclusion is based on the text from the SMP Use Activity Polices for Piers, Part D, which reads that "[p]iers associated with single family residences should be discouraged." CP at 812. The Board also found that the 150-foot proposed dock would be a first of its kind on the southwest side of Fox Island. This finding is supported by the testimony of Ramos who testified as much. The Board found that allowing the proposed dock would set a precedent for allowing other similar docks in the area. Halsan testified that a proliferation of docks had already occurred at the Bella Bella site, and Carlson testified that the examiner partially based their approval of dock permits at the Bella Bella site on there already being docks constructed at the site. The Board found that a proliferation of docks would lead to a degradation of aesthetic values on the beach. Reetz testified that the other side of the island where there were numerous docks and piers had an unpleasant quality. The Board could have reasonably inferred the same to the southwest side of the island where the Nieszes sought their project.

34

Finally, the Board found that there would be significant community loss of use because beach walkers would be obstructed and marine recreation would be affected. The Nieszes argue that the Board erred in not presuming that the Nieszes will comply with applicable DNR standards in the future, which require accommodation of beach walking, and in doing so the Board "impermissibly shift[ed] the burden of proof as to alleged cumulative impacts." Br. of Appellant at 7. Again, the Nieszes' offer to provide for additional conditions on the permit did not alter the duty of the Board to rule on the specific permit before it, which did not contain such conditions. *Hayes v. Young*, 87 Wash.2d 280, 291, 552 P.2d 1038 (1976). For the reasons above, these findings are substantiated by sufficient evidence in the record.

We hold that the board did not err when concluding that there would be cumulative impacts from the project.

### D.    *Not Arbitrary or Capricious*

The Nieszes challenge the ultimate issue in this case, that the Board erred in denying its request for a SSPD. The Nieszes must show that the Board decided this case with "willful and unreasoning action in disregard of facts and circumstances," in order to compel us to overturn the Board's decision for being arbitrary or capricious. *Buechel*, 125 Wn. 2d at 202. We hold that the Nieszes have failed to show that the Board's decision was anything but honest and made with due consideration, even if a different conclusion could have been reached. *Buechel*, 125 Wn.2d at 202. Because the Board made its findings and conclusions in a well-reasoned manner and with due regard of the facts and circumstances, we hold that the Board did not err when denying the Nieszes' request for a SSPD.

IV. CONSTITUTIONALITY

The Nieszes appear to argue that the Board's rulings violated their constitutional rights. Specifically, they assert a limited "as applied" constitutional challenge to the statutes and regulations relied on by the Board, arguing that use of "their" shoreline property is a "fundamental right." Br. of Appellant at 41-2. We disagree.

First, we address whether the Nieszes have any "fundamental right" to the public shoreline, and we hold that they do not. The Takings Clause provides that private property shall not be taken for public use, without just compensation. U.S. CONST. amend. V. This clause applies to the taking of a landowner's riparian rights as well as to the taking of an estate in land. *Stop the Beach Renourishment, Inc. v. Florida Dep't. of Envtl. Prot.*, 560 U.S. 702, 713, 130 S. Ct. 2592, 177 L. Ed. 2d 184 (2010). However, "[i]n Washington, abutting landowners have no riparian rights in state-owned tidelands and shorelands." *Caminiti v. Boyle*, 107 Wn.2d 662, 673, 732 P.2d 989 (1987). "To hold otherwise would be to deny the power of the state to deal with its own property as it may deem best for the public good." *Eisenbach v. Hatfield*, 2 Wash. 236, 253, 26 P. 539 (1891). Moreover, the Washington Constitution explicitly provides,

> The state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes: *Provided*, That this section shall not be construed so as to debar any person from asserting his claim to vested rights in the courts of the state.

WA. CONST. art. XVII, § 1.

The State, through its legislature, has created a statutory scheme (the SMA) that may give abutting landowners the license to use the State's tidelands and shorelands, but the State likewise can revoke that license by repealing the statute in the event it sees fit to do so. *Caminiti*, 107 Wn.2d at 673. The Nieszes argue, without citation to authority, that "use of their shoreline property is properly understood not as a privilege, to be allowed solely as Pierce County sees fit, but rather is based on a fundamental right." Br. of Appellant at 42. This argument fails because the Nieszes do not have fundamental rights to the public shoreline, which is the property of the State. WA. CONST. art. XVII, § 1. Construction of a private recreational dock on public shoreline is properly understood as a privilege that may only be granted to applicants who meet the regulatory requirements set forth by the SMA. We hold that the Nieszes' claim of a "fundamental right" to build a dock on public shoreline is without merit.

The Nieszes next apparently argue that they have a vested property interest by virtue of their application for a permit. We disagree.

A property interest arises for a permit applicant when there are articulable standards that constrain the decision-making process and those standards substantially limit the discretion of the decision-maker. *Durland v. San Juan County*, 182 Wn.2d 55, 71, 340 P.3d 191 (2014). Courts have found that a property interest exists when an applicant is entitled to a permit or variance having met certain criteria. *See Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir.1998) (holding that "specific, mandatory" and "carefully circumscribed" requirements constrained discretion enough to give rise to property interest). Conversely, "a statute that grants the reviewing body unfettered discretion to approve or deny an application does not create a property right." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir.

2005). A requested permit constitutes a constitutionally protected property interest "if discretion [to deny the final issuance of the permit] is substantially limited." *Durland*, 182 Wn.2d at 71; *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994).

Here, the Nieszes argue that because their "proposal does not have any discernable environmental impacts to the aquatic habitat or species that rely upon it and is deemed a reasonable use," that the Board's discretion is limited in the face of private property rights. Br. of Appellant at 42. This argument fails.

We determine whether the applicable provisions controlling the grant of a permit are couched in mandatory language giving rise to a legitimate claim of entitlement. *Durland*, 182 Wn.2d at 73. The Nieszes cite *Maytown Sand and Gravel, LLC v. Thurston County*, 191 Wn. 2d 392, 432 P.3d 223 (2018), for the proposition that they have a cognizable property interest in the publicly owned tidelands near their property because of their status as permit applicants. In *Maytown*, a mining company purchased land from the government with the express assurance that a permit to start a mining operation was valid and with the government's implicit approval to start mining. 191 Wn.2d. at 399. In that case, even though the company held an actual permit, our Supreme Court held that "because the permit contained expired premining conditions that had not been satisfied by those deadlines, the permit by itself was not enough to prove a constitutionally protected interest to the mine." 191 Wn.2d at 431. Our Supreme Court in *Maytown* recognized a cognizable property right for that applicant only because in addition to the permit it held, it had also received numerous letters from the agency conveying that all permitting requirements had been met. 191 Wn.2d at 432. When viewed in the light most favorable to *Maytown*, our Supreme Court held that "those letters . . . constitute[d] sufficient

evidence that Maytown had a protected property right to mine as of [the date] when the Department determined that all premining conditions had been satisfied." *Maytown*, 191 Wn.2d at 432. Our Supreme Court reasoned that once the agency had conveyed to the applicant that their permit was all but approved, when "the Department determined that all [permitting] conditions had been satisfied[,]" that only then had a property interest in the proposed mine vested because the decision making process was thereby constrained and discretion substantially limited, even though the permit was not yet formally approved. 191 Wn.2d at 432.

Here, the record is devoid of evidence that the Nieszes obtained any assurances for permitting from the Board or any other agencies connected to the approval of their SSDP under the SMA or local regulations. Unlike *Maytown*, the Nieszes do not own the land, and they also never received any permit. Indeed, the Nieszes were denied at each stage of the process, and the record is replete with findings and conclusions of various agencies and review bodies showing that the Nieszes had not satisfied the requirements for permitting. Therefore, under *Maytown*, it cannot be said that the Nieszes had a cognizable, vested property interest in the public tidal lands where they sought to build their private single-use dock. 191 Wn.2d at 431. We hold that the Nieszes' constitutional challenge to the Board's denial of their SSDP application on the grounds that they had a vested property interest vis-à-vis their permit application is without merit.

IV. REQUEST FOR ATTORNEY'S FEES

The Nieszes, the Reetzes, and the Wests, all request attorney fees. Because the Reetzes and the Wests are the prevailing parties in this appeal, we award reasonable attorney's fees and costs to them. RCW 4.84.370.

The Nieszes argue that they are entitled to attorney fees under the RCW 4.84.340, 350. That statute provides authority for petitioners to recover attorney fees from a state agency for successful court challenges of the agency action. However, the statute does not provide a basis for fees when the agency is simply acting as an adjudicative agency and is but a nominal party on review. RCW 4.84.350. More importantly, the Nieszes are neither the prevailing party, nor have they successfully challenged any agency action. Thus, the Nieszes are not entitled to attorney fees on appeal.

RCW 4.84.370 provides that if a party prevails or substantially prevails on appeal to the Court of Appeals, and also prevails before the Board and before the superior court, that that party is entitled to recover reasonable attorney's fees and costs incurred on appeal. Here, the Reetzes and the Wests are the prevailing party on appeal. Thus, they are entitled to reasonable attorney fees.

## V. CONCLUSION

In conclusion, we hold that substantial evidence supports the Board's findings, and that the Board did not err in making its conclusions. We further hold that the Board's decision to affirm the county's denial of the Nieszes' permit request was not arbitrary or capricious. Finally, we hold that the Board decision denying the development project was not unconstitutional.

We deny the appellants request for attorney's fees and costs, and award attorney's fees and costs to the respondents.

No. 52658-1-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

_____
Melnick, J.

_____
Sutton, A.C.J.